270 So.2d 547 (1972)
264 La. 44
STATE of Louisiana and The Parish of Caddo
v.
GULF STATES THEATRES OF LOUISIANA, INC., et al.
No. 52132.
Supreme Court of Louisiana.
June 29, 1972.
Dissenting Opinion July 10, 1972.
On Rehearing December 18, 1972.
*549 William J. Guste, Jr., Atty. Gen., Harry H. Howard, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Charles R. Lindsay, Asst. Dist. Atty., for plaintiffs-applicants.
Wilkinson, Woods, Carmody & Peatross, Arthur R. Carmody, Jr., John M. Madison, Jr., Shreveport, Breazeale, Sachse & Wilson, Hopkins P. Breazeale, Jr., Baton Rouge, for defendants-respondents.
SUMMERS, Justice.
Article 106 of the Criminal Code denounces as obscene the exhibition with intent *550 to primarily appeal to the prurient interest of the average person of lewd, lascivious, filthy or sexually indecent motion picture film. Acting on this authority the district attorney of Caddo Parish, on behalf of the state and parish, brought this action against defendants, the owners and operators of the Broadmoor Theatre in Shreveport, to abate as a public nuisance the showing of the motion picture "The Stewardesses". The action was brought under the procedure prescribed by the Abatement of Nuisances Statute, Sections 4711-4717 of Title 13 of the Revised Statutes.
On this basis, and the sworn statement of facts contained in the petition filed by the district attorney, the trial judge issued an order restraining and enjoining the exhibition of the motion picture. At the same time, as the statute prescribes, a rule to show cause within five days why a permanent injunction should not issue was served on defendants. Defendants filed motions to dismiss, exceptions of no cause and no right of action, a plea of unconstitutionality and motion for continuance. On the fifth day all motions and exceptions were overruled and the trial of the rule proceeded. A full hearing was had on the question of the obscene nature of the film with the State assuming the burden of proof. At the conclusion of the evidence, the trial judge announced his reasons for judgment from the bench. He said:
. . . the evidence as a whole shows that there was no plot or story to the movie and that it was merely scenes and acts in the context that made them lewd, lascivious, obscene and sexually indecent, and therefore in the opinion of this Court the dominant theme of this movie, "The Stewardesses" taken as a whole is designed to appeal to sexual prurient interest, and it is offensive and affronts contemporary standards relating to sexual matters and is without any redeeming social value. Its showing is therefore a nuisance and it is the judgment of this court that an injunction be granted. . . .
A formal judgment was accordingly rendered and signed permanently enjoining defendants from showing any version of the motion picture within Caddo Parish.
On appeal to the Second Circuit, Section 4712 of Title 13 of the Revised Statutes was declared unconstitutional. Accordingly, the judgment of the trial court was reversed and the injunction recalled. 255 So.2d 857. An act of the legislature having been declared unconstitutional, we granted certiorari upon the plaintiff's application. 257 La. 154, 260 So.2d 698.
At the outset we hold that we agree with the trial judge and decide that "The Stewardesses" is obscene. The record amply supports the trial judge, and there is no manifest error in his findings. There was no plot or story. The movie consisted merely of a series of scenes or incidents portrayed in a context which made them lewd, lascivious, obscene and sexually indecent. The dominant theme is designed to appeal to prurient interest. The movie is offensive and affronts contemporary standards of the average person in the community, and it is without any redeeming social value. We note, also, that obscenity is not within the area of constitutionally protected free speech. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).
Defendants' claim of unconstitutionality is that the Abatement of Public Nuisances Statute (La.R.S. 13:4711-4717) is a device to suppress without notice or hearing the right to exhibit this motion picture. As such, they say, the statute violates defendants' freedom of expression guaranteed by the First Amendment of the Federal Constitution and Article I, Section 2 of the Louisiana Constitution. Further, it is contended the statute is unconstitutional in that (1) its "rule nisi" provisions casts the *551 burden of proof on defendants; (2) there is no provision in the statute for a speedy trial court decision; (3) there is no speedy appellate procedure; (4) the mandatory penalties requiring that the building in which the nuisance exists be padlocked for one year violates the property owner's due process of law rights, and (5) the body of the act is broader than its title.
The part of the Abatement of Public Nuisances Act, Part A (La.R.S. 13:4711-4713) with which we are concerned, pertinently provides that an obscene motion picture, as defined by the criminal laws of this State, and the premises where it is displayed, are declared to be nuisances and shall be enjoined. By the terms of Section 4712 of the Act, the district attorney, the sheriff or the parish governing authority, any corporation or association formed in this State for the suppression of vice, and any citizen of the parish may maintain an action to enjoin and abate such a nuisance. "Upon the presentation of the petition for injunction alleging that the nuisance exists, verified by the affidavits of at least two persons, or verified by the affidavit of the district attorney or other parish official hereinabove designated on information and belief, the judge . . . shall grant a temporary injunction without bond." A rule nisi must be issued, returnable in five days, and a hearing shall be had thereon. No such action may be brought by anyone other than the district attorney or other parish official hereinabove designated until the applicant obtains a certificate from the district judge that the applicant is acting in good faith and not for any improper purposes.
The injunction action may be dismissed upon contradictory motion. The motion to be accompanied by sworn statements of the mover and his attorney setting forth the reasons for dismissal.

I
The principal thrust of the attack upon the constitutionality of the act is aimed at the quoted provision declaring that "the judge . . . shall grant a temporary injunction." It is contended that there is no requirement that probable cause be shown through factual allegations in the affidavit accompanying the petition; that is, the mandate that the judge "shall" grant the temporary injunction deprives the judge of any discretion in the matter; the implication being that the judge must issue the temporary injunction whether the nuisance exists or not. For this reason, it is asserted, the First Amendment right of freedom of expression enjoyed by makers and exhibitors of motion pictures is restrained without reasonable cause.
This argument lacks merit. The statute requires that the petition allege the existence of a "nuisance" and that it be verified by the district attorney. This makes it necessary for the trial judge to determine, on the basis of the facts alleged, whether "obscenity", as defined by Article 106 of the Criminal Code, is "carried on" before he issues an injunction. If the allegations and the accompanying affidavit do not, in the judge's opinion, recite facts which warrant a conclusion that a "nuisance" is being "carried on" then the prerequisites to the issuance of the injunction have not been satisfied and the judge must not sign the temporary injunction. On the other hand, if the allegations of the petition and the accompanying affidavit do set forth, in the judge's opinion, that a "nuisance" is being carried on, then, and in that event, he "shall" issue the temporary injunction.
Under this view a great deal of discretion is left to the trial judge for a judgment on his part must be made. He must ascertain from the petition and accompanying affidavit whether the facts set out fulfill those elements of the law which, taken together, constitute a nuisance. For instance, in this case, the petition must allege that the film must have been, and is being, exhibited with intent to primarily appeal to the prurient interest of the average person. And it must be lewd, lascivious, filthy or sexually indecent.
*552 It is not mandatory that the judge sign every petition placed before him whether it is properly supported by the facts or not. We doubt that any trial judge so construes this statute. He "shall" sign only those injunctions which are supported by a sworn petition which alleges facts which constitute a nuisance. This is what occurred in this case. In the petition which he presented the district attorney alleged in detail the exhibition of the movie, the location of the theater in close proximity to a public elementary school and a Baptist Church; that the movie was viewed by many people and that the movie was lewd, lascivious, obscene and sexually indecent and, as a whole, appeared only to prurient interests, and that it was without any redeeming social value whatever, particularly describing the details of the movie. In addition to the sworn statement of the district attorney, the assistant district attorney made oath to the verity of the allegations.
The word "shall" as used in this statute is nothing more than the mandate the law imposes upon the judge to issue an order, as in other cases, when the rights of the parties are supported by the law and properly alleged facts; e. g., "An injunction shall issue . . . ." La.Code Civil P. art. 3601; "A temporary restraining order shall be granted without notice when it clearly appears from specific facts shown by a verified petition or by supporting affidavit. . . ."
Any restriction imposed in advance of a final judicial determination on the merits of obscenity must be limited by the shortest fixed period compatible with sound judicial resolution and the proceedings must be assured of a prompt final judicial decision. A period of fourteen days would not be too long within which to commence such proceedings. United States v. Thirty-seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).
Some prior restraint is necessary if the efforts of states to regulate obscenity are to be enforcible. Delta Book Distributors v. Cronvich, 304 F.Supp. 662 (W.D.La. 1969).
Thus the procedure provided by the statute under review provides a reasonable basis for restraint. The judge is furnished with reliable information to satisfy himself of the factual basis for the issuance of the injunction. Lee Art Theatre, Inc. v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L. Ed.2d 1313 (1968). While the protection against prior restraint is an important right, it is not an absolute one. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S. Ct. 1325, 1 L.Ed.2d 1469 (1957).

II
It is obvious that the Abatement of Nuisances Statute has given these defendants ample protection. The statute provides for the issuance of a temporary injunction to maintain the status quo if the judge is satisfied that a nuisance exists. He must set a date for an adversary hearing within five days thereafter. At that time a judicial determination of obscenity must be made. This was done in the case at bar. And the plaintiff here assumed the burden of proving obscenity as the law requires. Pearce v. Johnson, 213 So.2d 117 (La.App.1968); Cloud v. Dyers, 172 So.2d 528 (La.App.1965). Thus, the statute was constitutionally applied in that the burden of proof was sustained by the plaintiff. And when a statute is constitutionally applied it must be upheld against a claim of constitutional infirmity on its face. ABC Books, Inc. v. Benson, 315 F.Supp. 695 (M.D.Tenn.1970); Gable v. Jenkins, 309 F.Supp. 998 (N.D.Ga.1969); Rage Books, Inc. v. Leary, 301 F.Supp. 546 (S.D.N.Y. 1969).
Accordingly the claim that the "rule nisi" provisions casts the burden of proof on defendants is not well-founded.

*553 III
There is ample provision in the statute for a speedy trial court decision. Five days after issuance of the temporary restraining order, the matter was heard and determined. This time interval meets the constitutional test set out by the United States Supreme Court in United States v. Thirty-seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), where a fourteen-day period was approved. The fact is that defendants found the time too short, or so they alleged, for they sought and were denied continuances or delays on several occasions. ABC Books, Inc. v. Benson, 315 F.Supp. 695 (M.D.Tenn.1970).
Procedural laws applying to injunctions generally are to be read into the contested act as supplementary thereto when they are not in conflict. In keeping with this obvious proposition, a reference to Article 3606 of the Code of Civil Procedure is relevant. It sets forth the time limitation for decision on a preliminary injunction:
When a temporary restraining order is granted, the application for a preliminary injunction shall be assigned for hearing at the earliest possible time. . . . (Emphasis added.)
In our view the requirement that the hearing on the preliminary injunction be held at the "earliest possible time" carries with it the clear implication that the decision on the hearing also must be forthcoming at the "earliest possible time." Such a requirement is the most stringent the law can impose, for surely the law cannot demand the impossible. That is what occurred in this case. The hearing was held and decided the same daythe "earliest possible time."
The argument is without merit that Section 4207 of Title 13 of the Revised Statutes, requiring that judges render judgments within thirty days after the case is submitted, permits an unreasonable delay. Although the section referred to does generally permit a thirty-day delay for rendition of judgments, this does not preclude the imposition of a shorter delay as in injunction cases. The applicable delay in the case at bar is that prescribed by Article 3606 of the Code of Civil Procedure.

IV
The contention that there is no speedy appellate procedure prescribed in the statute is also untenable. The judicial determination of obscenity in the first instance is a speedy procedure as we have set forth in Part III. The appeal procedure is as expeditious as the machinery of courts can reasonably be expected to function in such cases. La.Code Civil P. arts. 3601, 2081-2167. The matter was appealed to the Second Circuit and decided within five months. An application for rehearing was denied within fifty days. We granted writs in thirty-seven days. A motion for special assignment in this court was granted. In our view this was a reasonably prompt determination.
As Mr. Justice Harlan said in A Quantity of (Copies of) Books v. Kansas, 378 U. S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964):
It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances. On the other hand, the subject of sex is of constant but rarely particularly topical interest.
Moreover, under a proper showing, the effect of the injunction may be suspended pending the appeal. La.Code of Civil P. art. 3612.

V
Defendants contend that the statute contains mandatory penalties requiring that the building in which the nuisance exists be padlocked for one year and this statutory requirement violates the property owner's due process of law rights. The *554 statute does not make it mandatory that the building be padlocked for one year. It provides that the court shall direct the effectual closing of the building "for the period of one year, unless sooner released." La.R.S. 13:4714. The clause "unless sooner released" means that the closure may be for a lesser period than one year, six months, a week, a day, or for no time as in the instant case. The building has not been padlocked. Only the showing of the film in Caddo Parish was abated. Defendants have been in business operating the Broadmoor Theater continually since the seizure of "The Stewardesses" film.

VI
It is asserted that the body of the act is broader than its title and for this reason the act violates the title-body clause of Article 3, Section 16 of the Louisiana Constitution: "Every statute enacted by the Legislature shall embrace but one object, and shall have a title indicative of its object."
The title of the 1970 amendment complained of sets forth:
To amend and reenact Sections 4711 and 4715 of Title 13 . . ., relative to the abatement of the public nuisances of assignation, prostitution or obscenity, to provide with respect to the enumeration of items declared to be nuisances in premises in which assignation, prostitution or obscenity is carried on, conducted, continued, permitted or exists; to provide with respect to the discontinuance of abatement proceedings upon the giving of bond by the owners of such premises by establishing an additional condition regarding obscenity; and to otherwise provide with respect thereto.
It should be noted that this title seeks only to amend two sections of the six-section act. Even a casual reading of the title and body of the act makes it readily apparent that the title is more than adequate to comply with the title-body clause of the Constitution.
The title of an act must be broadly construed with a view to effectuating, not frustrating, the legislative purpose. This is the sense in which this court has many times construed the title-body clause of the Constitution. Bethlehem Supply Company v. Pan-Southern Petroleum Corp., 207 La. 149, 20 So.2d 737 (1945). In resolving this issue, the presumption exists that the act is constitutional. State ex rel. Board of Com'rs., etc. v. Bergeron, 235 La. 879, 106 So.2d 295 (1958).
There is no violation of the title-body clause here.
For the reasons assigned, the judgment of the Court of Appeal is reversed and set aside, and the judgment of the district court is reinstated and made the judgment of this court.
McCALEB, Chief Justice (concurring).
I agree with the majority holding that those portions of R.S. 13:4711-4717 which authorize the granting of a permanent injunction to abate a public nuisance as defined therein are not unconstitutional for any of the reasons urged by the defendants herein. I express no opinion, however, on that portion of the statute which provides for the granting of a temporary injunction when the petition for injunction is accompanied by affidavits of two other persons or the specified parish officials. It is my view that the question of whether the temporary injunction was properly issued in the instant matter passed out of the case and became moot when the judgment, ordering a permanent injunction, was rendered after a full hearing. For, assuming for the sake of discussion that the provisions anent the issuance of a temporary injunction are of doubtful constitutionality, their invalidity would in no way affect the provisions authorizing the granting of the permanent injunction which are clearly *555 severable from and not dependent on those which authorize the temporary injunction.[1]
It is therefore unnecessary that we determine, at this time, the validity of the provisions of the enactment which would require the issuance of a temporary injunction. Under these circumstances, this Court should not consider that part of the statute which deals with the procedure for obtaining a temporary injunction. Instead, it should adhere to our well-settled policy that the constitutionality of a statute will not be considered when it is not essential to a determination of the rights of the litigants in the case before it. Aucoin v. Dunn, 255 La. 823, 233 So.2d 530 (1970).
I respectfully concur.
TATE, Justice (dissenting).
I respectfully dissent. The issue in this case is not obscenity but censorship.
The judges of the Court of Appeal, Second Circuit, unanimously held that La.R.S. 13:4712 offended constitutional protection of freedom of speech and communication insofar as it sought to be applied to padlocking premises for the showing of motion pictures. They so concluded (1) because it mandatorily requires an injunction closing a motion picture premises for a minimum of five days, on the ex parte affidavits of two persons or of a parish official alleging that the premises are a nuisance in which obscenity is carried on, and (2) because it does not provide for prompt judicial decision permitting, on successful review, the prompt re-opening of the enjoined movie. As our Second Circuit notes, the decisions of the United States Supreme Court require this holding.
In the instant case, a small group of seven citizens from the same neighborhood, six of them belonging to the same church, felt that the movie appealed to the prurient interests of the average person and had no redeeming social features. They described certain scenes suggestive of sexual activity or misconduct. One of them complained that one of the actresses used bad language, namely "damn" and "bastard" (whether more than once he did not say).
These complainants, acting under the authority of the statute, complained to the district attorney and, through his filing this abatement suit, secured the closing of the show "The Stewardesses". These seven individuals' testimony alone is used as the basis for enjoining the showing of this film since June 25, 1971, first (June 25-30) on the ex parte affidavit of the assistant district attorney, then (June 30 to date), after the hearing, indefinitely without suspensive appeal.
From the record, neither the district attorney nor the trial judge ever saw the film. Relying upon the offended senses of these seven individuals, and their description of what they felt to be objectionable parts of the film, the film's showing was first enjoined, ex parte and without bond. Without viewing the film but accepting the testimony of these seven individuals at the hearing, the trial court then permanently enjoined the film's showing. No member of this court has ever viewed this film.
I should further note that the same statute authorizes the premises in which obscenity is carried on to be closed for a year. La.R.S. 13:4714. The plaintiffs in fact have prayed for this additional sanction. While the trial court refused this relief, in its ruling it specifically warned the defendants that, if another complaint came before it, the court would apply this harsh sanction. Tr. 279-280 (presumably, only after weighing the testimony of the complaining *556 group of witnesses that the sexual scenes were offensive to them).[1]
In overlooking the serious constitutional defects in the statute, the majority suggests (1) although the statute states that, "Upon presentation" of the verified petition for injunction, the trial judge "shall" issue the injunction "without bond", it really means that the trial judge "may" do so, (2) the circumstance that the statute does not require decision within a reasonable time, really means the decision should be made "within the earliest possible time" (divining this, because of a Code of Civil Procedure article to the effect that "a preliminary injunction shall be assigned for hearing at the earliest possible time", Article 3606), and (3) a speedy appellate procedure is available, since after all the closing of this show was decided by the intermediate court within five months (plus fifty days for the denial of rehearing), while this court (after writs were granted on February 11, thirty-seven days later, 260 La. 698, 257 So.2d 154), has only taken four and a half months to render its decision (and will take only an additional month to act on this rehearing).
If we assume to start with that the film is obscene, these delays may not seem inordinate. After all, the exhibitor was not entitled to show the movie at all, the saying goes.
Such an approach overlooks that, assuming a film is ultimately held unobjectionable and entitled to be protected against censorship by the Constitutions of the United States and of Louisiana, this same summary closing by an outraged few, not necessarily representative of informed opinion of the community, could not under our state procedures be annulled by appellate action for from five to ten months.
Special mention should be made of the five-day ex parte closing of motion pictures by the procedure involved. The normal showing of a film is for a week or less. The exhibitor normally has to pay minimum rentals for the use of the film, whether or not any audience sees it. The mere threat of a small group to secure this ex parte closing, even for only five days, would deter an exhibitor from even attempting to show a film, no matter how groundless the objections of the few are. I might also add that, as this present proceeding illustrates (see text at Footnote 1), the potential sanction of padlocking the premises for a year results de facto in censorship power being given to private individuals, who by the mere threat of seeking to obtain it may deter future showings of other films to which such a small private group may also object.
Incidentally, nowhere has it been proved that the showing of this movie violates any of the criminal laws of this state relating to obscenity or pornography. No criminal prosecution has ever been attempted. What we have before us is the distaste for this film of seven private individuals (an extremely decent group, with very high morals, it is true), who upon receiving word from a neighbor who had seen the movie in Colorado that it was objectionable, went to see it with the purpose of filing a complaint and closing the show.
Even these individuals admit that the film in question, "The Stewardesses", is not hard core pornography. Nudity and sexual activity, according to their testimony, is suggested rather than actually depicted. *557 Profanity or the so-called four-letter words are not utilized, the speech objected to by the witnesses being mostly double entendre.
The evidence shows that, before its closing by ex parte injunction on June 25, some 12,000 people of Shreveport had seen "The Stewardesses" after it opened on June 11, with 95% of the comments about it favorable. During the summer of 1971 it was nationally rated as one of the ten most popular pictures exhibited in the United States. It has been exhibited in some 180 American cities, including New Orleans, Houston, Dallas, and Beaumont, and has been seen by over 3,000,000 persons.
The defense witnesses who saw the film described it as a spoof or satire on the alleged sex life of airline stewardesses. They regarded it as entertainment appealing to humor rather than to prurient sexual instincts.
Fundamentally, when obviously in the local community and in this State and in this nation a great many would not find this film objectionable, its closing (or the closing of any film) upon the objections of only a few private individuals should not be sanctioned, in the absence of procedural safeguards providing for judicial determination that the showing of the film violates our criminal law and in the absence of procedural safeguards providing for prompt appellate relief from holdings which may unconstitutionally censor the showing of such films.
The Louisiana Court of Appeal, Second Circuit, properly found that the statute, under which the showing of this film is enjoined, does not provide such procedural safeguards and that therefore its application here violates constitutionally-protected freedom of speech and communication. I think that court's unanimous opinion dissolving the injunction should be affirmed, and I respectfully dissent from our majority opinion reversing it.
DIXON, Justice (dissenting).
I dissent.
I agree fully with the dissent of Justice Tate. The statute, R.S. 13:4711 et seq. is unconstitutional on its face as it applies to restricting an individual's First Amendment freedoms. I would affirm the judgment of the Court of Appeal.
This court has never viewed the film, yet we find the film obscene, without a plot or story line, lewd, lascivious, sexually indecent, appeals only to prurient interest, affronts and offends contemporary community standards of decency, and is without any redeeming social value. It should be incredible that the majority of the court could make this holding without viewing the film. Not even the trial court judge or the district attorney who brought the prosecution viewed the film. In fact, there is no evidence that any judge who has participated in this case has viewed the film.[1]
The basic test for obscenity was laid down in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. It is: "to the average person, applying contemporary community standards, the dominant theme of the material as a whole appeals to the prurient interest." The community standard referred to is a national community standard. Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 795. That this film has been shown in at least one hundred eighty cities in the United States without ever having been censored, save in Shreveport, Louisiana, is substantial evidence that it does not offend national standards. See A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1.
In Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, the procedure for review of allegedly obscene material was laid down: (1) the state must bear the burden of proving the film's obscenity, *558 (2) action by the censor must be subject to immediate court review, and (3) the final court decision must be available within a very short time. The procedure laid down by R.S. 13:4711 et seq. does not meet the first and third tests. A prompt final judicial determination has been suggested to mean sixty days. Teitel Film Corporation v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966. This would mean that this court would have to render its final decision within sixty days after the institution of the procedure to censor the film.
One of the most repugnant features of R.S. 13:4711 et seq. is that it does not give the trial judge discretion. The statute provides that the trial judge "shall" issue the injunction when a petition and certain affidavits are filed. The statute has no requirement that the injunction issue upon a showing of probable cause.[2] Another repugnant feature of the statute is that it does not have any requirement that the judge view the film.
The Bill of Rights of the Louisiana and United States Constitutions are once again subordinated to statutory material that, on its face, is unconstitutional.
BARHAM, Justice (dissenting).
I concur in the dissenting opinions of Mr. Justice Tate and Mr. Justice Dixon, but I feel I must very pointedly call attention to the fact that for over a year the exhibiting of the motion picture "The Stewardesses" has been suppressed in Caddo Parish as obscene, and to this date no judge, no judicial tribunal, has yet viewed that film to determine whether its expression is protected by the First Amendment or whether it is obscene and therefore outside the ambit of that protection. It is incomprehensible to me that without even viewing the material alleged to be obscene in order to make an objective finding, the majority has concluded that "The Stewardesses" is obscene.
In State v. Eros Cinema, Inc., 259 So.2d 912, handed down on the same day as this opinion, we took note of the question posed by the United States Supreme Court as to whether a magistrate issuing a warrant for seizure of a motion picture might be required to view it before seizure. See Lee Art Theatre v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313. There can be no doubt that a judicial determination which would finally suppress any expression as being obscene requires personal observation and review of that obscene material unless through no fault of the State it has been destroyed or is otherwise unavailable. I make this point at the beginning of this dissent in order to quickly indicate how unreasonable, how judicially unsound, is the majority opinion here in its totality.
But the issue before us, as I see it, is whether the relevant law, R.S. 13:4711-17, is constitutional insofar as it attempts to enjoin and suppress obscenity. These statutes permit the total ex parte suppression of any expression thought by two citizens to be obscene. They provide for an automatic and ex parte five-day injunction and negate any judicial discretion in this regard. Release of the allegedly obscene material may be had only upon response to a rule nisi (a rule to show cause why the material should not be permanently enjoined) or a motion to dismiss stating cause. Thus the defendant is required to carry the burden of establishing that his expression is protected by the First Amendment. The five-day mandatory injunction, which may be had without any hearing during that time, appears to conflict with our own requirement for speedy judicial hearing expressed in State v. Eros Cinema, supra. The present proceedings, being civil in nature, fall within the general *559 law for civil appellate review, and that procedure is inadequate according to our expression on speedy appellate review in Eros Cinema, this day decided.
The Second Circuit Court of Appeal properly found that the statutes as applied to obscenity lacked the necessary safeguards constitutionally required for the protection of freedom of expression. See Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460; Kingsley Corp. v. Regents of U. of N.Y., 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512; Marcus v. Property Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127; Manual Enterprises v. Day, 370 U.S. 478, 83 S.Ct. 1432, 8 L.Ed.2d 639; Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584; Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793; A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809; Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649; Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966; Interstate Circuit v. Dallas, 390 U.S. 676, 88 S. Ct. 1298, 20 L.Ed.2d 225; Lee Art Theatre v. Virginia, supra; Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1. Cf. Kingsley Books v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469; Times Film Corporation v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403; Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498; United States v. Thirty-seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822.
On June 26, 1972, the United States Supreme Court granted certiorari in three cases concerning the First Amendment privilege and obscenity. In Paris Theaters v. Slaton, on the docket of that court, 408 U.S. 921, 92 S.Ct. 2487, 33 L.Ed.2d 331, the questions presented by the petition for review were whether a temporary restraining order against exhibiting allegedly obscene film is precluded by absence of statutory procedural safeguards, and whether such may issue before an affirmative showing that the pictures offend customary standards of decency. The Georgia Supreme Court had ruled in that case very much as the majority has here. Slaton v. Paris Adult Theatre I, 228 Ga. 343, 185 S.E.2d 768. In addition to a review of the Georgia Supreme Court's holding and the questions set forth, the United States Supreme Court asked for special briefing and argument on the question: "Whether the display of any sexually oriented films in a commercial theatre, when surrounded by notice to the public of their nature and by reasonable protection against exposure of the films to juveniles, is constitutionally permissible?"
The questions presented for review when the court granted certiorari in Alexander v. Virginia, 408 U.S. 921, 92 S.Ct. 2490, 33 L.Ed.2d 332, to review a decision of the Virginia Supreme Court, Alexander v. Commonwealth, 212 Va. 554, 186 S.E. 2d 43, were whether prohibition of jury trial to determine obscenity prior to restraint on literary materials and application of the citywide community standards of judging obscenity rather than the national standard violated the Constitution. The court asked for special brief and argument, as in Paris Theaters, on whether regulated sale of sexually oriented magazines to adults is constitutionally permissible.
In Kaplan v. California, 408 U.S. 921, 92 S.Ct. 2493, 33 L.Ed.2d 331, certiorari was granted to review an appellate court decision, People v. Kaplan, 23 Cal.App.3d Supp. 9, 100 Cal.Rptr. 372. Among the many questions presented concerning the sale of an allegedly obscene book was whether the adoption of state community standards as opposed to national standards violates First Amendment guarantees.
While the exact legal guidelines for determining whether, when, and how obscene expressions are protected by the First Amendment are in a state of flux, it is certain that our statute does not meet the *560 minimum standards now required by the United States Supreme Court.
For the reasons assigned by the Court of Appeal, Second Circuit, those assigned by the other dissenting justices, and those I have stated and the authorities cited, I respectfully dissent.

ON REHEARING
McCALEB, Chief Justice.
This rehearing was granted principally for reconsideration of two contentions: First, whether the fact that no member of this Court, nor the judge of the district court rehearing the case, had seen the motion picture precluded the Court from properly appraising defendant's constitutional privilege of free speech under a civil charge of obscenity;[1] and, second, because the point was stressed again that we were wrong in applying a contemporary community standard instead of the national standard in determining that the picture was obscene and, hence, not entitled constitutionally to the protection of the First Amendment.
While the case was pending on rehearing, the Court viewed the picture, which has served only to confirm our original conclusion, based on the statements of the witnesses who testified for the state, that the film portrays solely hard-core pornography in all respects. It has no plot or any other feature, in our estimation, which takes it out of that category,[2] despite the protestations of defense counsel to the contrary anent its popularity and box-office appeal. The latter argument exhibits, perhaps, public curiosity, but it does not rescue the lurid content of the film from the gutter.
If ever a motion picture fit exactly into the definition of obscenity as set out in Section 251.4(1) of the American Law Institute's Proposed Model Penal Code, cited by the United States Supreme Court with approval in Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), this one does. The pertinent portion of that definition is to the effect that "Material is obscene if, considered as a whole, its predominant appeal is to prurient interest, that is, a shameful or morbid interest, in nudity, sex or excretion, and if in addition it goes substantially beyond customary limits of candor in describing or representing such matters. * * *" Under that definition, this picture is not only hard-core pornography, but is obscene to an extreme degree.
As to the second contention, i. e., that the state did not prove the national standard to be applied for determining whether the picture is obscene, we are convinced there is no way of proving a national standard in these cases. It seems to us, unless it is shown by affirmative evidence on the part of the defendant that the contemporary community standard is not in accord with the national standard, the contemporary community standard must be presumed to be the national standard. Who, in any case, is qualified to expound reliable expert evidence as to the national standard of obscenity? Is it Variety Magazine, espoused by defendant? We think not.
*561 Until, therefore, such affirmative evidence as to a national standard is offered by the defendant, we hold to the test laid down in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498,[3] i. e., "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."
This test was reaffirmed in Jacobellis v. Ohio, supra, the court adding, however, it must be determined in the first instance that the material "goes substantially beyond customary limits of candor in description or representation of such matters," which verbiage is quoted from the definition of obscenity as given in the Proposed Model Penal Code, above quoted.
In that case the Court also explained that by "contemporary community standard" in the Roth-Alberts test, it meant the "national standard;" consequently, that the constitutional status of an allegedly obscene work must be determined on the basis of a national standard. However, the court laid down no guidelines as to how such a "national standard" may be established or proved. Instead, in a footnote the court refers, apparently with approval, to the Model Penal Code, a New Jersey decision, and a treatise entitled "Censorship of Obscenity: The Developing Constitutional Standards." 45 Minn.L.Rev. 5, by Lockhart and McClure.
But these authorities offer no aid in determining the manner in which a "national standard" as to obscenity may be arrived at or proved. The code merely provides evidence is admissible to show "the degree of public acceptance of the material in the United States." Article 251.4(4) (d). The New Jersey case[4] does no more than discuss the Roth-Alberts test and the subsequent decision in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639, in which the court held obscenity is a two-fold concept, requiring proof of (1) patent offensiveness, and (2) "prurient interest" appeal.
The law review article points out the weakness inherent in such an approach thusly: "But if the contemporary standards of particular state and local communities are not constitutionally applicable, whose standards are? If we turn to the national communitythe American public in generalwe find this standard illusory. * * *
"Beyond hard-core pornography we find ourselves without a reliable guide when we look to `community standards.' For as Judge Jerome Frank pointed out more than ten years ago, `we do not know, with anything that approximates reliability, the "average" American public opinion on the subject of obscenity.'"[5]
Significantly, after detailed study of obscenity cases, the authors of the Minnesota Law Review article conclude that "Of the national community's contemporary standards, we know only that contemporary American society rejects and will not tolerate the dissemination of hard-core pornography."
As we read the decision, the Jacobellis case is authority for the proposition that only the United States Supreme Court is qualified to apply constitutional standards and criteria for an ultimate determination on appellate review, on a case to case basis, whether the dominant theme of the reprobated material, "taken as a whole appeals to prurient interest," and, thus, is or is not protected by the First Amendment.[6]
In the instant case, we conclude that the motion picture is obscene and, therefore, not insulated from state restraint as a nuisance under authority of R.S.13:4711-4717.
Counsel for defendants have reurged their contention that R.S. 13:4712 is unconstitutional, *562 being violative of the due process clause of the Fourteenth Amendment in that the statute fails to provide adequate procedural safeguards for a hearing in protection of defendant's right of free speech under the First Amendment.
Further, counsel citing the cases of Marcus v. Property Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), proclaim that the author of the concurring opinion on first hearing (the author of the present majority opinion) erred in failing to consider the validity of that part of R.S. 13:4712 which provides the procedure for the issuance of a temporary injunction. In reasserting their plea of unconstitutionality to that part of the statute, they claim that its invalidity infects the remaining portions thereof, resulting in the unconstitutionality of the entire enactment.
A study of the cited cases reveals that counsel are correct in their contention that, in cases such as this (involving the First Amendment privilege), the validity of the entire statute is always to be considered. Hence, the author of the concurring opinion erred in applying the general rule relative to temporary restraining orders and injunctions to this case which deals with the constitutional right of defendant to show the film in question.
A consideration of that issue, however, does not affect the result reached on our first hearing, for the reason that the concurring justice (the author of the instant majority opinion), after a study of that part of the statute providing for the issuance of a temporary injunction, has concluded that, for the reasons set forth in the first majority opinion, the statute is valid in that respect. It would serve no useful purpose to reiterate those views herein.
Finally, defendants have urged again their contention that R.S. 13:XXXX-XXXX is unconstitutional in that it is violative of Section 16 of Article III of the Louisiana Constitution, providing that every act shall have but one object and that object shall be indicated in its title. On first hearing, we found this claim clearly without merit. We adhere to that conclusion, believing that further elucidation here would be superfluous.
For the reasons assigned, our original opinion is reinstated and made the final judgment of this Court.
BARHAM, J., dissents with written reasons.
DIXON, J., dissents. The court of appeal was eminently correct. It is regrettable that this court approve, even for a short time, a censorship statute, especially while other adequate constitutional means of controlling obscenity are available to law enforcement officials.
TATE, J., concurs in BARHAM, J.'s, primary dissent and in DIXON, J.'s, dissent and assigns additional written reasons.
BARHAM, Justice (dissenting).
On June 25, 1971, the district attorney for Caddo Parish filed a petition for a temporary restraining order as well as for a permanent injunction against Gulf States Theatres of Louisiana, Inc., Greater Broadmoor Theatres, Inc., Joe Gianforte, and their agents and employees, alleging "upon information and belief" that these parties were showing a motion picture believed to be obscene. The restraining order, a permanent injunction, and abatement of the film and the theatre as a nuisance were *563 sought under authority of R.S. 13:4711-4717. Upon presentation of the petition for injunction, accompanied by the verification affidavit of the district attorney and his assistant, the court temporarily enjoined the defendants from removing any personal or other movable property from Broadmoor Theatre, from opening the theatre, and from exhibiting the motion picture "The Stewardesses". The defendants were directed to show cause five days thereafter why a final injunction should not issue closing the Broadmoor Theatre for a period of one year. On the return date of the rule for a permanent injunction evidence was taken, and oral reasons for judgment were given in open court. Two days later a judgment was signed permanently enjoining all of the defendants from exhibiting the motion picture "The Stewardesses" within Caddo Parish, Louisiana.
On appeal the Second Circuit Court of Appeal declared R.S. 13:4712 unconstitutional as applied to expression, and held that it could therefore not serve as a basis for a temporary restraining order or a permanent injunction against the exhibition or publication of suspected obscenity. 255 So.2d 857. We granted writs as a matter or right because an act of the Legislature had been declared unconstitutional. Bradford v. Department of Hospitals, 255 La. 888, 233 So.2d 553 (1970).
The defendants' position is that after a financially successful two-week showing of the motion picture "The Stewardesses", they were, and they remain, permanently enjoined from showing any version of that motion picture. That picture has been exhibited in more than 180 cities throughout the nation and been viewed by more than 3,000,000 people. Defendants allege they are permanently deprived of revenue of approximately $10,000.00 per week since they cannot show this picture, which is what is usually termed a "box-office success". At any time during the year and a half from the initial suppression to date the defendants could very profitably have exhibited this film for several weeks. It is apparent, then, from this viewpoint alone that no issue raised by the defendants is moot. They suffered immediate palpable injury which continues in perpetuity under the permanent injunction.
Moreover, certain features in the statutes under which this action was brought make any adjudication in the present case perpetually effective against these defendants' right of expression.[1] Under authority of one of those provisions the trial court has stated that if there is any showing of a similar film, the Broadmoor Theatre will be closed for all purposes for one year.
Also without validity is any argument that the attack upon the initial ex parte temporary restraining order has become moot since a permanent injunction has issued in this case after adversary hearing. The subsequent hearing, even if full and adequate basis for the permanent injunction, does not make moot the attack upon the constitutionality of the statutory provisions for the original ex parte suppression. When any judgment is obtained in proceedings where the Fourteenth Amendment right of due process is denied, the need to vindicate the aggrieved party's constitutional rights requires a reversal.
A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), and Marcus v. Property Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), were each postured very similarly when reviewed by the United States Supreme Court. In each an initial seizure of obscene publications was made under procedures lacking the safeguards required for due process so as to assure non-obscene material the constitutional protection to which it is entitled. After a full adversary hearing in each case upon notice and with other due process procedures, the seized materials were declared obscene and held for destruction. In each case the court *564 pretermitted any question of obscenity in fact or of the validity of the judgment after hearing, considering only that the procedure leading to the original ex parte seizure was constitutionally deficient. Judgment in each case was reversed for that reason alone.
In Marcus the court stated: "* * * We have no occasion to reach the question of the correctness of the finding that the publications are obscene. Nor is it necessary for us to decide in this case whether Missouri lacks all power under its statutory scheme to seize and condemn obscene material. Since a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights the judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion." (Emphasis here and elsewhere has been supplied.)
In A Quantity of Books v. Kansas, supra, the court said: "Nor is the order under review [condemning the material to destruction as obscenity] saved because, after all 1,715 copies were seized and removed from circulation, P-K News Service was afforded a full hearing on the question of the obscenity of the novels. For if seizure of books precedes an adversary determination of their obscenity, there is danger of abridgement of the right of the public in a free society to unobstructed circulation of nonobscene books. * * * Here, as in Marcus, `[s]ince a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights' * * * the judgment resting on a finding of obscenity must be reversed." See also Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).
The defendants, having alleged that the statutes under which this action is maintained were unconstitutional under the Fourteenth and First Amendments, having established palpable injury from the moment of the original ex parte suppression to date and even in the future, and having alleged a chillingmore, a freezingeffect upon their constitutional right of free expression in the future, have standing in this court to test the validity of the statutes under their several attacks of unconstitutionality. Therefore, we initially dispense with the question that any portion of the defendants' attack upon the constitutionality of the several provisions is now moot.
The attacks upon the constitutionality of the statute are so numerous that it is difficult to enumerate them and even more difficult to find an adequate form for a judicial expression upon the various issues.[2] *565 We are here concerned with the State's right to regulate obscene expression. Every exercise of the State's right to control obscenity "* * * implicates questions whether the procedures * * * were adequate to avoid suppression of constitutionally protected publications. `* * [t]he line between expression unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn * * *. The separation of legitimate from illegitimate speech calls for * * * sensitive tools * * *'. Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, 1472. It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech". Marcus v. Property Search Warrant, supra.
Keeping constantly in mind, then, that under consideration here is the delicate line of demarcation between unconditionally guaranteed freedom of speech and one of the very limited exceptions under which speech and expression may be legitimately regulated or suppressed, I examine the attacks upon the constitutionality of Louisiana Revised Statutes 13:4711-4717.
A history of the development of the statutes casts light upon the consideration of the constitutional attacks. The statutes originated with Act 47 of 1918, which was an act to declare houses of prostitution and their contents nuisances and to provide means to enjoin and abate them. All seven provisions, R.S. 13:4711-4717, remained unchanged for over 40 years. In 1960 the Legislature attempted by Act 201 to amend Section 4711 to include obscenity with prostitution in the definition of a nuisance.
Chapter 32 of Title 13 of the Revised Statutes of 1950 is titled "Particular Classes of Actions and Cases". Part I is titled "Abatement of Public Nuisances". Subpart A, titled "Houses of Prostitution", contains these statutes which remained as originally enacted when the Revised Statutes of 1950 were adopted. They provide, as the title indicates, only a civil action for the abatement of the nuisances of houses of prostitution. Subpart B of Chapter 32, Part I, is a group of statutes designed to control and to abate the public nuisance of gambling houses. The control of prostitution, as indicated, originated in 1918. Two years later the control of gambling through abatement as a public nuisance was legislated. Disorderly houses (when properly defined), houses of prostitution, and gambling houses have always been subject to control, regulation, and suppression under the police power of the state. Moreover, the control of nuisances in general is usually governed in some part by police regulations. Analogous to the common law nuisance is our Civil Code Article 669, which states insufferable inconveniences are regulated and governed by the custom of the place and the "rules of the police". At common law, nuisances per se include those activities which are forbidden by criminal law and sanctions.
Through development of a special civil action for the abatement of the nuisance of prostitution, our Legislature provided that houses of prostitution could be abated upon the petition of the district attorney or upon the petition and proper affidavit of interested parties. But the control of the act of prostitution is in no wise analogous to the control of obscenity. Although it may be possible to incorporate in some manner under the title "Abatement of Public Nuisances" the control of places where obscene expression is exhibited, published, or otherwise communicated, there is no corollary between control of the nuisance of prostitution and control of expressions *566 which are subject to regulation only when they cross over that fine line into obscenity. A reading of R.S. 13:4711-4717 in light of their development and in light of their original purpose of controlling only the nuisance of prostitution makes apparent the reasons for the numerous attacks upon these statutes when they are used to control obscenity. The provisions must then be examined with careful consideration of the guarantees of freedom of expression afforded by the United States Constitution, Fourteenth and First Amendments, and Louisiana Constitution Article I, Section 3.
R.S. 13:4711 declares any place a nuisance where there exists prostitution or obscenity as defined by the criminal laws of the state. R.S. 13:4712 provides the procedure for an ex parte temporary injunction and for permanent injunction after hearing on a rule nisi to abate the nuisance perpetually. R.S. 13:4713 provides for contempt penalties for violation of any of these provisions relating to the injunction and for lien upon and seizure and sale of the property where the nuisance was conducted for the fines imposed upon a finding of contempt. R.S. 13:4714 closes the place where the nuisance existed so that it cannot be used for any purpose for a period of up to one year. R.S. 13:4715 and 4716 provide for bond for release of property and disposition of fines and collection of fees. R.S. 13:4717 provides that judgment as to what constitutes a nuisance "may be based on the general reputation so proven".
The statutes are attacked as being unconstitutional on their face for several reasons. Attack is made upon the language of R.S. 13:4712 which mandates that a temporary injunction "shall" be granted by the judge upon the simple allegation by the district attorney upon information and belief of the existence of obscenity without any requirement of a showing upon probable cause that obscenity is being published in some manner. When the district attorney presents the petition and his verified affidavit, the judge is required without the exercise of discretion to issue a temporary injunction. If one other than the district attorney or other parish official named in the statute brings the action, it is required only that a certificate be obtained from the judge that the applicant is acting in good faith and not for improper purposes. In either instance no adjudicative function at all is required. The statute calls only for a simple ministerial act by the judge. "Shall" is a command leaving no room for discretion. Naquin v. Iberia Parish School Board, 157 So.2d 287 (3rd Cir. 1963). As the appellate court succinctly stated: "* * * Rather than a judicial mind passing on the relative merits of the petition, the judicial hand is forced by the Legislature to sign a temporary restraining order."
However, even if the literal wording of the statutethe word "shall"were construed as not requiring a simple ministerial act by the judge, this Court is still forced to find that there are no standards prescribing the consideration for a judicial determination of whether to issue or to refuse to issue the temporary restraining order. Is judicial determination for issuing the ex parte order made "from specific facts shown by verified petition or by supporting affidavit that immediate and irreparable injury, loss, or damages will result to the applicant before notice can be served and a hearing had"? C.C.P. Art. 3603. This is the ordinary basis for the issuance of a temporary restraining order. Certainly these Code of Civil Procedure requirements are not sufficient to satisfy the First Amendment requirements. If the court were considering whether a Fourth Amendment warrant for search and seizure was properly issued, it would examine the affidavit for facts to establish probable cause to review the basis for that judicial determination. However, there is no method whereby a requirement of probable cause for a criminal search warrant can be read into a civil statute for abatement of nuisance. So, if it is assumed arguendo that the judge is not mandated to act but can make a judicial determination to issue or *567 not to issue the ex parte injunction, the statute is nevertheless unconstitutional because no standards are set which govern the judicial determination for the issuance of the ex parte injunction.
Although the State may regulate the dissemination of obscene expression since obscenity is an exception to the constitutionally protected right of free speech, the State is required to observe stringent safeguards in the exercise of this right to prohibit. The very minimum constitutional standard required before there can be a suppression of an expression alleged to be obscene is an independent judicial finding of probable cause that the expression is obscene and therefore not constitutionally protected speech. Marcus v. Property Search Warrant, supra; A Quantity of Books v. Kansas, supra; Bantam Books v. Sullivan, supra.
In State v. Eros Cinema, Inc., 262 La. 706, 264 So.2d 615 (1972), we specifically and unanimously determined that there could be no seizure of an allegedly obscene expression without a prior judicial determination of an adequate factual basis for a probability that the expression constitutes obscenity. In that case, as in a number of cases decided by the United States Supreme Court which are cited there, we are considering a seizure under a search warrant for the purpose of criminal prosecution.
In Marcus v. Property Search Warrant, supra, the court, pretermitting the question of lack of hearing before seizure, held the seizure under the warrant unconstitutional for the warrant gave total discretion to the executing officers to make an on-the-scene determination of what constituted obscene publications. In Marcus the court also condemned the issuing of warrants and the seizure of the allegedly obscene materials "* * * on the strength of the conclusory assertion of a single police officer, without any scrutiny by the judge of any materials considered by the complainant to be obscene". That court concluded: "Mass seizure in the fashion of this case was thus effected without any safeguards to protect legitimate expression."
The case at hand can be compared with Marcus. Here the simple verified affidavit of the district attorney on information and belief sustains an immediate order of suppression by injunction of alleged obscenity. This suppression is equally as effective as, and perhaps more onerous than, a seizure under search warrant. Moreover, the order for temporary injunction in the instant case is a mass suppression such as was condemned in Marcus, for it contains the following proviso: "And further from conducting the said nuisance known as the Broadmoor Theatre and especially exhibiting the motion picture, `The Stewardesses'." The order does not suppress only one film; it suppresses all films. The statute on its face permits this suppression without any prior judicial determination, even ex parte, that the material to be suppressed is probably in fact obscene. The lack of standards for a judicial determination of probable cause is contrary to the numerous United States Supreme Court pronouncements that this is a minimal requirement for constitutionality of statutes providing for suppression of alleged obscenity before an adversary hearing. There is no provision in our statute requiring an independent judicial determination of the probability of obscenity before an ex parte order of suppression issues.
The plaintiffs argue that there was actually a judicial determination of probable cause here. Even if such were the case (and I find to the contrary),[3] it avails *568 plaintiffs naught. The fact that in a particular case a judge does make a probable cause determination of obscenity before signing the temporary restraining order cannot rehabilitate a statute constitutionally defective because it fails to adopt such a standard. While a statute not unconstitutional on its face may be unconstitutionally enforced, a statute which is unconstitutional on its face cannot be constitutionally enforced.
I am constrained to find that R.S. 13:4712 is unconstitutional on its face because it authorizes the total ex parte suppression of alleged obscenity without any independent judicial determination on facts that the expression is probably obscene.
Defendants further attack the constitutionality of R.S. 13:4711-4717 on the basis that they provide for prior restraint without notice or trial. Alternatively, defendants argue that if prior restraint can be had ex parte, adequate safeguards for speedy judicial adversary hearing are not provided.
I first address myself to a consideration of prior restraint in the context in which it is used in much of the current jurisprudence. The question then is bifurcated: (1) Can there be prior restraint of future publication, circulation, or exhibition of an obscene expression in a civil proceeding without notice and hearing after the initial publication of that expression? (2) If so, what are the limitations and safeguards required for constitutionality of such restraint?
I shall being the search for these answers with an examination of United States Supreme Court decisions which are concerned with state regulation of obscenity. Times Film Corporation v. Chicago, 365 U. S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), is often cited for the broad principle that prior restraint without notice and hearing may be had. The limited holding of Times Film Corporation is: "Petitioner's narrow attack upon the ordinance does not require that any consideration be given to the validity of the standards set out herein. They are not challenged and are not before us." The court posed the one question it answered: "* * * whether the ambit of constitutional protection includes complete and absolute freedom to exhibit, at least once, any and every kind of motion picture. It is that question alone which we decide." The court, with four justices dissenting, held the ordinance not void on its face under such an attack.
In Bantam Books v. Sullivan, supra, the court said: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. * * * We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint. * * *" (Citing Kingsley Books v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, 1957).
Then in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the limited holding of Times Film is re-expressed from Bantam Books to be "* * `whether a prior restraint was necessarily unconstitutional under all circumstances'". (Emphasis from Bantam Books.) The argument in Freedman was that if it was accepted as law that the first showing of a film may be restrained under proper guidelines and judicial protection, the provision for censorship in a Maryland statute was an "invalid prior restraint because, in the context of the remainder of the statute, it presents a danger of unduly suppressing protected expression". It was there said: "Applying the settled rule of our cases, we hold that a noncriminal process which requires the prior submission of a film to a censor avoids constitutional infirmity only *569 if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. * * * Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. * * * the procedure must also assure a prompt final judicial decision, to minimize a deterrent effect of an interim and possibly erroneous denial of a license."
But in A Quantity of Books v. Kansas, supra, a Kansas statute authorized the seizure of allegedly obscene books before an adversary determination of their obscenity and their destruction by burning or other means after that determination. Mr. Justice Brennan, author of that opinion, who also wrote the majority opinions in Marcus v. Property Search Warrant, Bantam Books v. Sullivan, and Freedman v. Maryland, cited those three cases as well as Kingsley Books, and finally determined that the failure to afford an adversary hearing made the procedure leading to the order of seizure of all copies of seven specified novels unconstitutional.
The State relies heavily upon Kingsley Books v. Brown, supra. Kingsley Books is a much misunderstood opinion. First, that case did not involve prior restraint without an adversary hearing although the language of the United States Supreme Court may lead one to believe such to be the case. There a petition was filed by the chief legal officer of the City of New York to enjoin several defendants from distributing a series of allegedly obscene booklets. No restraint was sought in that case except after an adversary hearing in response to the rule nisi, issued with the notice of the suit for injunctive relief, to show cause within four days why the defendants should not be enjoined pendente lite from distributing the books. The state court concisely held that "* * * when the court after an adversary hearingis able to read and examine the publications objected to, and acts judicially to enjoin their distribution, it is apparent that there is no `previous restraint' in the genuine historical and constitutional sense of that term". Burke v. Kingsley Books, 208 Misc. 150, 142 N.Y.S.2d 735 (1955). The United States Supreme Court in Kingsley recognized that the adversary hearing under the rule to show cause was dispensed with because the "appellants consented to the granting of an injunction pendente lite and did not bring the matter to issue promptly, as was their right under subdivision 2 of the challenged section, which provides that the person sought to be enjoined `shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial'". The protection of the preliminary adversary hearing before even a temporary restraining order could issue, a requirement of joinder of issue for final determination within one day after issue was joined, and the requirement that judgment be rendered within two days were actually the basis for the holding in Kingsley that reasonable safeguards were afforded for protection of First Amendment rights in that statutory scheme for control of obscenity.
In State v. Eros Cinema, supra, which I authored, this court found that there was no way to preserve the best evidence in a criminal prosecution for exhibiting an obscene film except upon seizure of the film under search warrant. For this reason we held that such a seizure is permissible in the limited quantity necessary where there are proper safeguards for establishing probable cause and for providing quick judicial determination on the merits, review, and final judgment. Our reason for believing this brief ex part seizure, or, if you will, temporary suppression, was necessary in that criminal prosecution does not exist in this civil suit to abate a nuisance. We found there that in a criminal prosecution the Fifth Amendment right against self-incrimination would not permit a subpoena duces tecum. However, in the instant civil action to abate a nuisance, the district attorney *570 used the device of a subpoena duces tecum to obtain materials he desired as evidence in this proceeding. The compelling reasons for permitting a seizure under a constitutional warrant as provided in the Fourth Amendment do not exist in a proceeding such as this not only for suppression of the showing of the particular film alleged to be obscene but for the closing of the theatre in which it is shown. In fact, the order of the court did nothing to preserve the evidence. The order of the court enforced without a hearing a total suppression of these defendants' right of expression in the theatre. Although emergency under an allegation of immediate threat to the morals of the community, i. e., the concept of clear and present danger, is not an exception to the requirements for notice and hearing before restraint, in the case at hand it is well to note that the motion picture alleged to be obscene had been exhibited for several weeks before action was taken by the district attorney, who had received numerous complaints upon which he had not previously acted. Time was not in fact as well as in law an element essential for consideration in issuing the order of suppression here.
A thorough consideration of these cases leads me to conclude that in a civil proceeding to abate an obscene expression as a nuisance there can be no prior restraint without an adversary judicial adjudication.
For the purpose of argument only, I then move to the alternative attack in connection with prior restraint, that if prior restraint were permitted by the statutes in such a case as this, the statutes are unconstitutional since the safeguards which must follow as set forth in numerous United States Supreme Court opinions are not provided in the statutes. This contention is correct. In Marcus, Bantam Books, Freedman, A Quantity of Books, and Lee Art Theatre v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968), the overriding holding is that whether under a licensing statute, a statute for injunction or destruction, or a criminal prosecution, there can be no prior restraint without notice and hearing by seizure under search warrant or suppression by other method unless immediate judicial determination in an adversary hearing is available and a speedy final judicial determination of the issue is provided.
Under the statutes at hand, the first hearing on the question of the actual obscenity of the suppressed expression is by rule to show cause five days after the initial suppression. Since the form of suppression is injunction, under our law there can be no suspensive appeal from the trial court's ruling. C.C.P. Art. 3612. An appeal from a final injunction is subject to the same delays as other appeals. Because of these delays, in a case such as this great injustice may be done if the expression originally suppressed by temporary restraining order is finally found to be a constitutionally protected expression. The motion picture here alleged to be obscene has been suppressed now for almost a year and a half. We said in Eros Cinema, supra, that we would require a hearing into the obscenity issue under seizure by search warrant within two days and a judgment at the trial court level 24 hours thereafter, and that this court would treat application for writs from an adverse ruling as remedial, thus assuring a speedy final determination of the issue. Here in this civil proceeding none of these protections are afforded although the consequences which flow from the suppression may actually be graver and more onerous than those under our criminal statute. Even if prior restraint were permissible, the statute would be unconstitutional because of not affording the safeguards for protection of First Amendment rights.
I have reserved for last consideration in this discussion of prior restraint the most serious constitutional defect in the statutes. This consideration arises under the original and historical application of the doctrine of prior restraint.
Actually, prior restraint in the contest of its historical origin and as discussed in most early jurisprudence is defined as that *571 restraint or suppression of an expression without judicial determination of the right to suppress before any publication, any exhibition, any communication of that expression. The prohibition against prior restraint predates even our Bill of Rights, in 70 Columbia L.Rev. 1403, 1409 Blackstone's theory of the prohibition against previous restraint involving freedom of the press is discussed. Blackstone took the view that there could be no previous restraints upon publications, saying: "Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity." I agree with the conclusion of the writer of that article that Blackstone's distinction between prior restraints against publication and punishment subsequent to publication has survived and is applicable to the present legal doctrine. The question under this historical and very limited expression of the doctrine prohibiting prior restraint is whether an evidentiary hearing and judicial determination are required before an expression which is obscene can be suppressed, prohibited, or restrained even before it is published, exhibited, or in any manner communicated. I am compelled to answer that, under this limited definition of prior restraint, suppression cannot be had without notice and a hearing.
In Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L.Ed. 1357 (1931), the court in language broader than the issue presented to it gave three examples of exceptions to the application of the doctrine, including attempts to control obscene publications. In Burstyn v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), the court appeared to remove the obscenity exception, and finally in Kingsley Books v. Brown, supra, the court correctly observed that the Near case had not concerned obscenity, and the exception of obscenity was discarded.
The doctrine of prohibiting prior restraint of expression without notice and hearing before the expression is ever published has more validity today than even in much earlier times when it was designed to prohibit the government from destroying printing presses so there could be no future publication. If these statutes do in fact prohibit expression without notice and hearing even before the expression is communicated, published, or exhibited, they violate the constitutional right of free expression under the First Amendment and our Constitution, Article I, Section 3.
State ex rel. Liversey v. Judge Civil District Court, 34 La.Ann. 741 (1882), was a suit where plaintiff, under an allegation of theretofore published false, malicious, and libelous material, sought an injunction prohibiting the defendants from publishing in any future issue of the newspaper, which he alleged had libeled him, any defamatory material. The court held that because of the constitutional right to free speech, libel and slander were "subjects of punitory, and not merely preventive, remedies. The Constitution rules over all". The injunction was held to be an absolute nullity. The court discussed the historical evaluation of liberty of the press, and stated that to allow an injunction aimed at prohibiting further publication of defamatory material would permit the establishment of a complete censorship over the press so enjoined. Since our court stated so clearly in that case that it cannot enjoin any future publication of defamatory remarks, certainly it should hold it cannot enjoin future publication of any and all expression. Defamatory and obscene speech are both limited exceptions to the First Amendment privilege.
R.S. 13:4712 providing for the mandatory restraining order, the delayed evidentiary hearing, and the final permanent injunction is buttressed by R.S. 13:4714, which states in pertinent part that if the existence of a nuisance is established under this set of statutes, "an order of abatement shall be entered as a part of the judgment in the case, which order shall direct the effectual closing of the building, structure, land or *572 other place against its use for any purpose for the period of one year * * *".
R.S. 13:4713 provides for contempt proceedings which may be brought ad infinitum carrying fines up to $250.00 and imprisonment up to six months. The fines levied for contempt become liens upon the place which has been closed for all purposes.[4] Therefore the combination of R.S. 13:4712, 4713 and 4714 places "prior restraint" as defined in its most limited sense and in its historical settingi. e., restraint of expression before it is communicated the first timeupon any future publication, exhibition, or expression whether obscene or not.
Gambling devices and the accoutrements of houses of prostitution, which may be and are controlled under the exercise of the police power, can be legally destroyed so as not to offend again. This, however, affords no basis for analogy with the suppression and regulation of speech and other means of expression.[5] In any regulation touching upon the area of speech and other expression there is a perfectly valid distinction between prior restraint and accountability after abuse. Louisiana Constitution, Article I, Section 3 reads: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." This is a clear and concise statement to our constitutional view that there can be no prior restraint of speech or other expression. One may speak, but when he exercises this privilege, he is accountable if there is an actual abuse of the privilege under one of the few exceptions to total freedom of expression.
R.S. 13:4714 does not permit mere bookburning or film destruction where there is an abuse of the First Amendment privilege. This provision has the effect of sledgehammering the printing press, the camera, the projectors, all the tools of expression in every medium, so that there can be no future expression at all for one who transgresses by crossing the line from free speech to obscenity upon one occasion. We can envision no more fatal defect of prior restraint under its original definition in a statute which attempts to control obscenity than that which is found in R.S. 13:4717. That provision mandates the court to effectively close the avenue of any expression whether or not it abuses the privilege and before it is so determined.
In Kingsley Books v. Brown, supra, a New York statute was upheld by the United States Supreme Court because "* * * as authoritatively construed, it studiously withholds restraint upon matters not already published and not yet found to be offensive". To the contrary under our statute there can be no expression of any kind good or bademanating either from the premises or from the devices on the premises for a period of one year. This is the very essence of the prior restraint condemned by Blackstone, by our Bill of Rights, and by our jurisprudence. Of all the constitutional violations on the face of these statutes, the prior restraint imposed under R.S. 13:4717 is the most offensive.
*573 I find that this particular section of the Revised Statutes does restrict expression not yet found to be an offense and not yet uttered. It is a classic example of prior restraint of speech and expression and is violative of federal and state constitutions.
Moreover, defendants correctly contend that these statutes effect deprivation of property without due process in violation of our Constitution Article I, Section 2. R.S. 13:4712 and 4714 in combination may close the premises where obscenity has been exhibited and deprive the owner of its use if the use of his premises for exhibition of obscenity was not known and could not have been known by him. R.S. 13:4715 does not give him adequate relief from this deprivation of property. It merely provides that upon posting bond with surety "in the full value of the property" and upon certain guarantees he may release the property. The exchange of the full value for the thing is as much a deprivation of property without due process as if the premises were retained. Again, if another obscenity is exhibited even entirely without the owner's knowledge, he must forfeit part of his bond each day of the exhibition. So. R.S. 13:4714, which is an exercise of unconstitutional prior restraint, also falls as a deprivation of property without due process of law.
It may be argued that since the statutory provision that the premises may be closed for use for any purpose for one year was not applied to the defendants in the judgment of injunction, they cannot complain of the constitutionality of such a provision. The defendants have standing to complain of R.S. 13:4714 for several reasons. First, Section 4714 provides that a judgment declaring an expression obscene and the premises a nuisance "may be based on the general reputation" of the premises or of the defendants or of the occupants or of habitual visitors thereto. Therefore, under the express provisions of Section 4717 it cannot be said that these defendants are not aggrieved by any judgment which declares that the premises they occupy and the activities they engage in on those premises constitute a nuisance. According to R.S. 13:4717 they may be adjudged guilty of operating a nuisance upon submission of the judgment in this case as proof of reputation. Certainly the judgment can under Section 4717 constitute some evidence in the future. Therefore, the judgment has a chilling effect upon the defendants' right to make any expression whether constitutionally protected or not, for fear of contempt penalties and further declaration of the premises as a nuisance.
However, the more pressing reason for recognizing defendants' right to contest the constitutionality of R.S. 13:4714 is found in the trial judge's reasons for judgment. There it was repeatedly stated by the judge that if the defendants were brought back into court for showing another moving picture of the same type as "The Stewardesses", the theatre would be closed for one year. The judge's final statement for reasons was: "But you know what the penalty is going to be if you show another one and come back and if it is shown that it is this same type of film, Mr. Carmody." Defendants are entitled to attack the constitutionality of this particular statute, and that provision is in absolute contravention of the principle of prior restraint upon expression and is also a deprivation of property without due process of law.
Defendants also allege that R.S. 13:4717 is unconstitutional. It reads: "On the hearing in any action filed under the provisions of R.S. 13:4711 through 13:4717 evidence of the general reputation of the building, structure, land or other place or of the defendant or of the occupants thereof or habitual visitors thereto shall be admissible, and judgment may be based on the general reputation so proven." I am very doubtful of the constitutionality of this provision in regard to a determination of what constitutes any public nuisance. Presumptions are provided for at law, and presumptions lie with one party or the other in certain civil proceedings. Burdens of proof shift according to the nature *574 of the proceedings and the nature of the proof required in the proceeding. However, we can find no expression of law permitting a judgment to be based solely on the general reputation of the parties to the suit or of the things involved. Certainly no judgment affecting the right of free speech could be based on general reputation. Proof that a person is repeatedly obscene in expression, that a press repeatedly has printed obscenities, that a building has repeatedly housed obscenity is not proof susceptible of sustaining a judgment that another expression from one of these is itself an obscenity. One may be punished for uttering obscenities, one may be held in contempt for refusing to refrain from circulating that which is obscene, but one cannot be adjudged guilty of a new obscenity on reputation alone. R.S. 13:4717, which is part of the whole general statutory scheme for the action against these defendants, is unconstitutional.
I move finally to what the majority lists as the second reason for reconsideration of this matter on rehearing. This is the contention that the wrong standard for determining whether the picture was obscene was offered in proof and used in the trial court for the determination of its judgment. I would have expected to be required to make long and detailed discourse upon the law to establish that a national standard and not a local community standard is constitutionally required. However, the majority opinion quickly agrees with me that the United States Supreme Court in Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793, stated unequivocally "that by `contemporary community standard' in the Roth-Alberts test, it meant the `national standard'; consequently that the constitutional status of an allegedly obscene work must be determined on the basis of a national standard." It is amazing then to see the majority, after this acknowledgement of positive constitutional law, avoid its application in the case at hand. It seems to do so under several totally non-legal postulates. The majority states that it is convinced there is no way of proving the national standard in these cases. It then, contrary to the constitutional requirements in proceeding for determining whether or not material is obscene, shifts the burden of proof to the defendant for establishing whether this expression is obscene under the national standard. The majority then condemns the U.S. Supreme Court for not laying down the procedural rules governing the evidence required for determining whether or not material is obscene under national standards. That majority would, I believe, ordinarily condemn federal encroachment on the states' right to establish purely procedural rules governing the evidentiary process in the states trial courts. Finally, the majority concludes the Jacobellis case is authority for the proposition that only the United States Supreme Court is qualified to apply constitutional standards and criteria to determine what is obscene. United States Supreme Court decisions with minor exceptions have dealt entirely with the right of the states to control obscenity. Only a few cases have dealt with federal control of obscenity such as through the mail or ports of entry. The Supreme Court in the cases cited by the majority and by me in this dissent deal exclusively with the limitations placed upon states in exercising control over the First Amendment privilege through local regulation of obscenity. I cannot fathom how the majority has determined that the United States Supreme Court has reserved for itself or the federal system alone a determination of the constitutionality of the states' attempts to regulate obscenity. Surely, that court is the final arbitor but just as surely the highest court of a state cannot disregard its responsibility and "check" the matter to the United States Supreme Court.
Moreover, I must note here that our court cannot bypass the question of the proper standard for the case at hand for the legislature under this statute permits the abatement of obscenity statewide. The effect of the judgment here upon defendants' future *575 right of expression throughout the state requires that the minimal standards for determining obscenity would be that of the entire state community. Certainly the standard cannot be that applied by the majority, i. e., what a majority of seven judges determine to be obscene under their individual moral standards.
I do not reach the question of whether or not the movie abated was obscene. My determination that these statutes are totally deficient in the constitutional requirements for regulation of expression that is obscene, and further that the actual application of the statutes here is unconstitutional, demands a declaration of a denial of due process. Obscenity as a fact, must be pretermitted. For these reasons, I respectfully dissent.
BARHAM, Justice (dissenting with additional reasons).
The defendants also attack the constitutionality of these provisions on the basis that the amendatory acts were insufficiently titled to permit the changes contained in the body of those acts. As previously stated, from 1918 until 1960 R.S. 13:4711 defined only prostitution as a nuisance, and it provided only that this nuisance could be enjoined and abated under provisions of R.S. 13:4711-4717. Although these several statutes appear under Chapter 32, Part I, "Abatement of Public Nuisances", Subpart A, "Houses of Prostitution", they have never been amended by chapter, part, or subpart, but only by individual section or statute.
Act 201 of 1960 was the first amendment addressed to any section or provision of Subpart A, "Houses of Prostitution". The title of that act read: "To amend and reenact Section 4711 of Title 13 of the Revised Statutes of Louisiana of 1950, relative to buildings, land, etc., declared nuisances." Under that very limited title places where obscenity was expressed or communicated were declared to be a nuisance along with places of prostitution. Obviously, the title to the 1960 act amending R.S. 13:4711 was not sufficiently broad to give notice to the legislators that they were about to place in the category of nuisance an exception to the First Amendment privilege of free public expression.
In 1968 the Legislature attempted to amend and reenact two others of these seven provisions in addition to amending a provision dealing with the abatement of gambling. The title to Act 362 of 1968 read: "To amend and re-enact Sections 4712, 4716 and 4722 of Title 13 of the Louisiana Revised Statutes of 1950, all relative to injunction to abate public nuisances, to provide with respect to the persons authorized to maintain actions in the courts to enjoin and abate the public nuisances of gambling and prostitution, and to provide with respect to the fees charged by the clerk of court and prosecuting attorney and disposition of the fines collected in actions to enjoin and abate the public nuisance of prostitution."
Under the declaration of this title that the purpose of the act was to provide for the enjoining and abating of the public nuisances of gambling and prostitution, R.S. 13:4712 was then amended to read as it reads now. That section provides the procedure for the temporary and permanent enjoining and abating of a nuisance. However, the title of the act clearly indicated to the legislators that the only public nuisances to be controlled were gambling (R.S. 13:-4722, not involved in the statutes here) and prostitution. The title by its strict limitation to gambling and prostitution would not permit the body of the act to define and control as a nuisance places dispensing obscenities through some form of public expression. Since the 1968 Legislature could not under the title of the amendatory act reenact R.S. 13:4712 for the purpose of controlling obscenity, that section cannot now be used to control obscenity as a nuisance.
Finally in 1970 Section 4711, which the 1960 act attempted to amend to include obscenity, *576 was again amended and reenacted along with Section 4715. The title of the amending act, Act 451 of 1970, is sufficiently descriptive and broad to include obscenity in the definition of a nuisance and to declare the premises where it exists an abatable nuisance along with places of prostitution. However, this subsequent amendment of Section 4711 alone and without reference to the other provisions, more particularly Section 4712, did not cure the defect in Act 362 of 1968 which amended and reenacted R.S. 13:4712. Obscenity could not have been and was not a nuisance in 1968 because of the 1960 act's defective title. Moreover, the defect in the 1968 title of confining the procedures for enjoining and abating nuisances under Section 4711 to prostitution did not and does not now permit that section to govern actions attempting to control any nuisance other than prostitution. It is the 1968 Legislature which had to have notice in the title of Act 362 of the extent of the amending provision. There was no way for the 1968 Legislature to be on notice that rights of speech and expression would be subject to the same police regulations as a common nuisance such as prostitution and gambling which were named in the title.
The 1968 amendment to R.S. 13:4712 referred to the nuisances defined in R.S. 13:4711, but, because of reasons previously noted, R.S. 13:4711 at that time could not and did not legally define obscenity as a nuisance along with prostitution. R.S. 13:4712 has never since been amended, and to this day it remains only a vehicle for enjoining and abating places of prostitution. The title of the amendatory act to R.S. 13:4712 is defective for more than its lack of definitiveness or broadness; the title is actually misleading in that it specifically expresses only that the purpose of the act is to prescribe a procedure for the control of the public nuisance prostitution.
Remembering that the Legislature could have amended the entire part or subpart containing these several sections of the Revised Statutes and that it chose rather to amend them section by section, I compare the failure of title in the acts amending these provisions with this Court's recent pronouncement of failure of title in State v. Welkner, 259 La. 815, 253 So.2d 192 (1971). Since at least some reference was made to chapter and part as well as to subpart in the title of the act we examined in Welkner, it may be said by comparison that the defect in title there was not nearly so obvious or so misleading as in the present instance. This Court cited with approval Southern Hide Co. v. Best, 176 La. 347, 145 So. 682 (1933), and said that no new matter could be enacted in the amendment of specific provisions of an indicated statutory section unless "the amendment is germane to the subject of the original act, and is embraced within the title of such amended act".
Obscenity could not have been included under the title of the original act of 1918 or under the title of the act of 1960 amending R.S. 13:4711. The title to the original act was not sufficient to incorporate within the present section R.S. 13:4712 the control of obscene expression. Reference in the amendatory act of 1968 to the statute sought to be amended could in no way give notice to the legislators that obscenity was to be included in the controls provided in that act. Additionally, the title of the amendatory act excluded obscenity from control under the actions provided in the act.
I repeat: Failure of the 1968 act to include obscenity within its provisions has not been cured by the amendment to a separate section in 1970. It cannot be presumed that the 1968 Legislature would apply harsh police power procedures permissible for control of prostitution to control of this exception to constitutionally protected speech. The 1970 Legislature provided no procedures for the abatement of obscenity. It only declared it to be an abatable nuisance. The limiting of the 1970 legislation to the specific section R.S. 13:4711 could not give notice that any other section not named would be amended so drastically as would be necessary to cure the title defect in Act 362 of 1968.
*577 I hold with the defendants' contention that obscenity cannot be controlled by the procedure for abatement and injunction of prostitution of R.S. 13:4712 because the title of the amending act did not include obscenity and expressly limited that provision's effect to prostitution. Therefore there are no provisions for actions or procedures to enjoin or abate places permitting the expression of obscenities. R.S. 13:4712 is unconstitutional as a procedure for controlling obscenity.
I respectfully dissent additionally upon this ground.
TATE, Justice (dissenting).
I concur fully in my brother BARHAM's principal dissent.
Our public nuisance statute is simply too blunt an instrument of regulation for the sensitive area of First Amendment freedoms. It permits, so to speak, the destruction of the printing press, as well as suppression of the book. The history of ten centuries of struggle for freedom of speech and press illustrates why statutes such as the present offend our Constitution, where the statutory sledge hammer may easily be used to smash protected expression as well as unprotected, without discrimination between them.
The motion picture under review is a prime example. The majority denotes it as "hard core pornography". With due respect, under contemporary standards (and probably those of previous generations), this is not in accordance with commonly accepted meanings of the term.
The motion picture in question deals obsessively with sex, an obsession shared (to judge from box office tallies) by large numbers of people of our present-day society. It has a thin story line, but it does possess one. Its indirect depiction of sexual activities leaves little to the imagination; anyone over the age of twelve or so would guess what is involved.
However, hard core pornography, as is commonly understood, is something that leaves nothing to the imagination: a child of eight would know what the adults were doing (although perhaps not why). Hard core pornography is such as that involved in In Re Haggerty, 257 La. 1, 241 So.2d 469 (1970), which explicitly depicted in detail sexual activity. Such showings commonly do not have any pretense at a story line, for instance, and close-ups of one sexual act after another are shown.
In the present case, the motion picture "The Stewardesses" was shown in first-run cinemas all over the nation. It attempted by exaggeration to illustrate a view of the life of airline stewardesses, involving the use of sex to fill their (depictedly) empty lives between flights. Aside from some of the comedy of the exaggeration, one could sense as a theme of the picture the futility and emptiness of such a way of life. For instance, the picture ends with the suicide of one of the heroines.
This "X" rated movie is certainly not family entertainment (nor are young people below the age of 18 permitted to see it). It is not the sort of show with which I would choose to while away my leisure hours (although millions of Americans apparently do find such a show entertaining). It has no more redeeming social value as entertainment than, say, a New Orleans Saints football game. However, as the senior members of our court may remember, it is certainly far less explicit and pornographic than many of the shows on Bourbon Street in the New Orleans of an earlier era (and perhaps of now, for all I know).
That our nuisance statute can be used to suppress a motion picture like this, and moreover to threaten the theatre itself with complete closing for a year because it showed it, illustrates why such a nuisance statute is unconstitutional insofar as sought to be applied in the sensitive area of the *578 First Amendment freedoms. Adults have in general a right to see and read what they wish to; to prohibit a showing or reading because it offends, not contemporary standards but those of a previous generation, is not permitted by our state and federal constitutions.
I therefore respectfully dissent.
NOTES
[1] In fact, Section 4 of Act 362 of 1968, which amended and reenacted R.S. 13:4712 (the section which provides for the issuance of the temporary and permanent injunctions), specifically declares that its provisions are severable and that the invalidity of one portion shall not affect other provisions which can be given effect with the invalid provisions.
[1] Tr. 279-280: "THE COURT: * * * I am holding that the showing of this movie is in violation of the statute. Period. Now if they show another movie and you come back in, showing that, then I think that possibly we would be justified in going ahead and doing what you are asking to be done, closing the business for a year." In this connection, the court had earlier stated with regard to closing the premises for a year, Tr. 279: "Now, as I say to the District Attorney, if you have another one, come back, and then they know what to expect from the premises itself."
[1] The film was not in the record sent to this court.
[2] The statute is so broad that, on presentation of a petition with affidavits by two persons that "Snow White and the Seven Dwarfs" is a "nuisance," because seven lecherous creatures take into their home an innocent young girl, the judge is required to grant an injunction.
[1] This complaint was vigorously registered by the three dissenting justices and voiced also by counsel for defendants during oral argument on rehearing as well as in their application for a rehearing and briefs on rehearing.
[2] The picture deals in disconnected sequences with the off-duty lives of airline stewardesses, (presumably) during stopover travel. The pursuits of these young women refer exclusively to their sexual encounters, showing them engaged in acts of fornication, lesbianism, masturbation and even, in one sequence, as the partner in an act of sadism.
[3] This is also the citation of Alberts v. State of California, decided the same day, the landmark decision on obscenity being referred to generally as the Roth-Alberts test.
[4] State v. Hudson County News Co., 41 N.J. 247, 196 A.2d 225 (1963).
[5] See Roth v. Goldman, 172 F.2d 788.
[6] In determining the film in the Jacobellis case was not pornographic, and, therefore, protected by the First Amendment, the court seemed to be impressed by the fact that the film had a plot. It stated the picture had been shown in approximately 100 large cities of the country, but admitted that while it was favorably reviewed in a number of national publications, it was disparaged in others. It also seemed impressed by the fact that it was rated by at least two critics of national statute among the best, films of the year in which it was produced; but it makes no mention of the opinion voiced by the numerous other critics of national stature. The court's conclusion, after viewing the film, was that it "was not obscene within the standards enunciated in Roth v. United States and Alberts v. California," which standards it reaffirmed.
[1] See R.S. 13:4713, 4714, 4717.
[2] Among the attacks are: (1) The statutes under First Amendment to the United States Constitution and Article I, Section 2, of the Louisiana Constitution are unconstitutional on their face and cannot be used as an ad hoc censorship device to suppress without notice or hearing these rights relating to freedom of expression, press, motion picture, radio and the like all of which are constitutionally protected. (2) The statutes are unconstitutional in that the trial court is required to issue an ex parte temporary injunction to immediately restrain or suppress an alleged obscenity upon presentation of petition and affidavits "on information and belief" with no requirement that "probable cause" be shown but with only a requirement that in some cases the trial court must determine the application to be "in good faith and not for any improper purpose". (3) The "rule nisi" provision unconstitutionally casts the burden of proof upon the defendants. (4) The statutes are violative of constitutional rights in their control of expression because they provide for prior restraint without an adversary judicial determination. (5) The statutes are unconstitutional in failing to provide for a speedy adversary hearing and decision, for speedy appellate review, and for speedy final judgment. (6) The statutes are unconstitutional in providing that the premises where any obscenity is found to exist shall be closed for all purposes for a year. (7) The statutes are unconstitutional in providing that defendants may be cast in judgment upon the basis of the general reputation of the premises or the persons frequenting them or of the defendants themselves. (8) The statutes are unconstitutional in that they provide for the destruction of property without due process. (9) The statutes are unconstitutional in that the body of each amendatory act is broader than its title, in that none of the amendatory acts gives any indication that it intends to regular basic rights of free speech and expression through definition and control of obscenity.
[3] The temporary restraining order was in fact issued in violation of constitutional due process required in the regulation of expression generally protected under the First Amendment. No facts at all were given to support a finding of probable cause. The district attorney on information and belief, without divulging the source of his information or asserting the credibility of the informant, recited hearsay for the purpose of alleging that the motion picture was obscene. This is even less than the content in the affidavits which were condemned in Marcus v. Property Search Warrant, 367 U.S. 717, 81 S. Ct. 1708, 6 L.Ed.2d 1127 (1961); and Lee Art Theatre v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968). There was in fact no finding of probable cause.
[4] Under this statute not only is the offensive, obscene material enjoined from exhibition, but none of the movable property or personal effects including equipment used to manufacture, exhibit, or distribute expression may be removed from the premises. And when the premises are closed, these effects along with the immovable closed become subject to the lien for contempt fines and subject to eventual seizure and sale to satisfy contempt judgments. This accomplishes a denial of the application of the doctrine of prohibiting previous restraint upon publication.
[5] This particular constitutional defect as well as others in the statutes we consider probably result from the fact that the two situations were analogized. R.S. 13:4711-4717 originally abated the particular public nuisance of houses of prostitution. The amendment of R.S. 13:4711 in 1970 to include obscenity, an exception to the First Amendment right, simply treated obscenity as a nuisance. Plaintiffs have attempted to use a 1968 procedure providing only the minimal safeguards for abatement of houses of prostitution.