274 So.2d 162 (1973)
STATE of Louisiana
v.
GAY TIMES, INC.
No. 52366.
Supreme Court of Louisiana.
February 19, 1973.
Dissenting Opinion March 5, 1973.
Rehearing Denied March 26, 1973.
Michael Silvers, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
This prosecution puts at issue the constitutionality of R.S. 14:106, the Louisiana obscenity statute, in its application to sexually explicit motion picture film.
Censorship (see, State v. Gulf States Theatres of Louisiana, Inc., 264 La. 44, 270 So.2d 547 (1972)) is not involved in this case, as in other cases involving motion picture film decided by the United States Supreme Court. See, Burstyn v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L. Ed. 1098 (1952); Interstate Circuit v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). This case is also distinguishable *163 from Lee Art Theatre v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968), in which a search warrant was quashed because its only basis was an opinion of the affiant that the material to be seized was obscene. The affidavit for the search warrant in the instant case summarized the film and particularized the explicit and clinical depiction of sex acts between four couples which constituted the entire movie (except for a brief introduction and electrocution scene at the end).[1] Unlike material in Kois v. Wisconsin, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), this film is not rationally related to the dissemination of ideas and information which are not prurient and it does not bear "some of the earmarks of an attempt at serious art."
The bill of information charges that Gay Times committed the crime of obscenity "by the intentional exhibition of lewd, lascivious, filthy and sexually indecent motion picture film ... with the intent to primarily appeal to the prurient interest of the average person ..."
The obscenity statute defines the crime, in the relevant section, as the "exhibition... with the intent to primarily appeal to the prurient interest of the average person, of any lewd, lascivious, filthy or sexually indecent ... motion picture film ..." R.S. 14:106(2).
The Louisiana obscenity statute first appeared in approximately its present form in the Louisiana Criminal Code of 1940. Its constitutionality was commented upon by the redactors of the 1940 code as follows:
"It has been urged that such statutes are unconstitutional violations of the rights of free speech and a free press. The courts have consistently held that the constitution gives no one the right to scandalize or otherwise shock the public. State v. Van Wye, 136 Mo. 227, 37 S.W. 938 (1896); State v. McKee, 73 Conn. 18, 46 A. 409 (1900). The regulation is obviously a just exercise of the police power."
R.S. 14:106 encountered some difficulty in State v. Roth, 226 La. 1, 74 So.2d 392 (1954). It was amended and encountered more critical treatment in State v. Christine, 239 La. 259, 118 So.2d 403 (1960).
Finally, State v. Roufa, 241 La. 474, 129 So.2d 743 (1961) and State v. Henry, 250 La. 682, 198 So.2d 889 (1967), sustained bills of information similar to the instant bill against contentions that they were too vague and indefinite to comply with the constitutional requirements. See, Art. I, § 10 of the Louisiana Constitution of 1921.[2]
Unfortunately, for an easy determination of the constitutionality of the obscenity statute, the United States Supreme Court reversed State v. Henry, supra, in a per curiam opinion, in which the court said:
"The motion to dismiss is granted and the appeal is dismissed for want of jurisdiction. *164 Treating the papers whereon the appeal was taken as a petition for a writ of certiorari, certiorari is granted and the judgment is reversed. Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515." Henry v. Louisiana, 392 U.S. 655, 88 S.Ct. 2274, 20 L.Ed.2d 1343.
Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) was another per curiam opinion in a case involving books, pictures, etc. Redrup seems merely to have summarized the then existing views of the various justices on the constitutional standards for obscenity cases, and to have found that the seizure of the printed materials in the cases then before the court did not comply with the standards of any of the justices.[3] Consequently, there is no easily ascertainable standard by which we may judge the constitutionality of the Louisiana obscenity statute as applied to moving picture film.[4]
The states can justifiably expect the Constitution of the United States, as interpreted by the United States Supreme Court, to require that efforts to control obscenity by criminal prosecution at least meet the standards enunciated in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The United States Supreme Court seems to say that the First and Fourteenth Amendments of the United States Constitution protect conduct (which can be considered, in some way, to be either "speech" or the communication of ideas) from state regulation unless the dominant theme of the conduct or material appeals to a prurient interest in sex, is patently offensive because if affronts a contemporary community standard of conduct, and is without redeeming social value.[5] Memoirs (Fanny Hill) v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).
Therefore, the question is: does the statute meet the constitutional requirements? We hold that it does. When the statute makes the exhibition "with the intent to primarily appeal to the prurient interest of the average person of any lewd, lascivious, filthy or sexually indecent film" a crime, it has established a community standard and it has reprobated material whose dominant theme appeals to the prurient interest in sex.
Whether the material has redeeming social value would appear to be a matter of defense. The exhibition of obscene matter may be justifiable because of its social value. If so, it "shall constitute a defense to prosecution for any crime based on that conduct." R.S. 14:18.
The other arguments of the defendant are also without merit.
Defendant complains of the introduction in evidence of a reel of film that was not actually a part of the picture "Benny Bungles It." Pursuant to the search warrant, two reels of film were *165 seized at the theatre. One reel had the title "Benny Bungles It" taped on the reel. The other reel bore no identification. The bill of information charged the exhibition of obscene film. The motion for the bill of particulars requested many things, including "precise identification of any publications exhibited." The answer to the motion for a bill of particulars gave precisely the information requested. There is no indication that the district attorney knew that the second reel was not a part of the film "Benny Bungles It." The bill of particulars "was never intended as a trap for the unwary district attorney." Official Revision Comment, C.Cr.P. 485.
The defendant also complains that the trial judge observed only fourteen minutes of "Benny Bungles It." The record shows that he also viewed the second reel containing the "shorts."
There is no substance to either complaint. Both films were relevant, admissible in evidence, and both should have been viewed by the judge. The defendant was in no way prejudiced by the failure of the State to further identify the "short" film in the bill of particulars.
Our review of "Benny Bungles It" confirms the conclusion of the trial judge; the balance of the film was mere repetition of the same or similar acts between different characters.
The defendant further contends that the conviction is illegal because the State introduced no expert testimony to establish that the film was utterly without redeeming social value, that the community standard of conduct was offended by the film and that the dominant theme of the film, taken as a whole, appealed to the prurient interest in sex.
This is, in effect, an attack upon the quantity and quality of the evidence. The film is in evidence. We have seen it. It is offensive by any standard.
The bill of information in the instant case charged that the defendant "did wilfully and unlawfully commit the crime of obscenity by the intentional exhibition of lewd, lascivious, filthy and sexually indecent motion picture film ... with the intent to primarily appeal to the prurient interest of the average person." The defendant contends that the obscenity statute in sections (2), (3), (4), (6) and (7) of R.S. 14:106 is unconstitutionally vague and broad, prohibiting acts which would be constitutionally protected under the Roth decision.
These contentions are made in spite of the fact that the bill of information is couched solely in terms of the exhibition of obscene motion picture film, reprobated by R.S. 14:106(2). In its motion for a bill of particulars, the defendant asked the State to specify under which sections of the obscenity act it was being prosecuted. In its answer, the State said: "Defendant is alleged to have violated subsections (2), (3), (4), (6) and (7) of the Louisiana Revised Statutes 14:106." In spite of this allegation in the motion for a bill of particulars, the bill of information, which must stand alone as the basis for this prosecution, charged an offense only under R.S. 14:106(2).
We limit our review here to the constitutionality of the section under which the defendant was prosecutedR.S. 14:106(2). We make no finding as to the constitutionality of any other section of R.S. 14:106. The sections of the statute are separable and do not depend upon each other for validity. See Section 3 of Act 167 of 1970.
Under the Roth standards, we find the second section of R.S. 14:106 to be violative of neither the First and Fourteenth Amendments to the United States Constitution nor Art. I, § 10 of the Louisiana Constitution of 1921.[6]
*166 Defendant's conviction and sentence are affirmed.
SANDERS, J., concurs in the result, being of the opinion that the conviction and sentence are properly affirmed.
BARHAM, J., dissents and filed opinion.
BARHAM, Justice (dissenting).
I dissent from the majority's holding in this case upon two grounds.
First, I am of the opinion that the majority does not state a realistic, a legalistic, a constitutional basis for regulation of obscenity as an exception to the guarantee of the First Amendment of the United States Constitution of free speech. As Justice Stewart said, dissenting in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), "Censorship reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime. Long ago those who wrote our First Amendment charted a different course. They believed a society can be truly strong only when it is truly free. In the realm of expression they put their faith, for better or for worse, in the enlightened choice of the people, free from the interference of a policeman's intrusive thumb or a judge's heavy hand. So it is that the Constitution protects coarse expression as well as refined, and vulgarity no less than elegance. A book worthless to me may convey something of value to my neighbor. In the free society to which our Constitution has committed us, it is for each to choose for himself." As a footnote to that portion of the opinion just quoted, Justice Stewart stated: "Different constitutional questions would arise in a case involving an assault upon individual privacy by publication in a manner so blatant or obtrusive as to make it difficult or impossible for an unwilling individual to avoid exposure to it. * * * Still other considerations might come into play with respect to laws limited in their effect to those deemed insufficiently adult to make an informed choice. * * *"
In that part of Justice Douglas's dissent in the Ginzburg case in which Justice Black concurred, Justice Douglas pointed out very cogently that our Constitution does not place limitations upon "free speech". He stated: "* * * If our Constitution permitted `reasonable' regulation of freedom of expression, as do the constitutions of some nations, we would be in a field where the legislative and the judiciary would have much leeway. But under our charter all regulation or control of expression is barred. Government does not sit to reveal where the `truth' is. People are left to pick and choose between competing offerings. There is no compulsion to take and read what is repulsive any more than there is to spend one's time pouring over government bulletins, political tracts, or theological treatises. The theory is that people are mature enough to pick and choose, to recognize trash when they see it, to be attracted to the literature that satisfies their deepest need, and, hopefully, to move from plateau to plateau and finally reach the world of enduring ideas."
There were four dissents in the Ginzburg case. The majority in Ginzburg and the majority of this court in the case which we now consider have adopted the standards for determining obscenity as laid down in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Many courts, including our own, when afforded the opportunity of speaking upon the standards of Roth have come to the conclusion that they are not understandable, that they are difficult if not impossible to apply, and that as they are applied, they fail to afford any consistent constitutional protection and often infringe upon constitutional rights.
In a per curiam opinion in Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), the United States Supreme Court appears to have laid down guidelines which more clearly define what *167 is obscenity and therefore subject to control by the government. The per curiam begins with this statement: "These three cases arise from a recurring conflictthe conflict between asserted state power to suppress the distribution of books and magazines through criminal or civil proceedings, and the guarantees of the First and Fourteenth Amendments of the United States Constitution." In holding that in all three cases the First Amendment right of free speech was infringed, the court said at p. 769, 87 S.Ct. at p. 1415: "In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; cf. Butler v. State of Michigan, 352 U.S. 380, 77 S. Ct. 524, 1 L.Ed.2d 412. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233; Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068. And in none was there evidence of the sort of `pandering' which the Court found significant in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31."
I am of the opinion that the Supreme Court there has finally laid down the proper guidelines for control of obscenity without infringing upon constitutional rights of freedom of expression. I adopt as my opinion of the correct standard to be applied in determining what expression may constitutionally be regulated as obscenity and therefore as an exception to the total freedom of speech "A Proposed Theory of Obscenity Controls" at pp. 495-503 of the book "The System of Freedom of Expression" (1970) by Thomas I. Emerson:
"* * * If an obscene communication is forced upon another person against his will it can have a `shock effect' and such a communication can properly be described as `action'. An obscene telephone call is an obvious example. But the problem is not confined to that form of communication. Generally speaking, as already noted, the effects of erotic material upon the recipient are presently unknown. But the available evidence does seem to establish that exposure to such material is for some persons an intense emotional experience. A communication of this nature, imposed upon a person contrary to his wishes, has all the characteristics of a physical assault. The harm is direct, immediate, and not controllable by regulating subsequent action. Such communications can therefore realistically be classified as action. Moreover, from a slightly different point of view, forcing obscenity upon another person constitutes an invasion of his privacy, and for that reason also falls outside the system of freedom of expression. The distinction between this area of conduct and the expression protected by the First Amendment touches a limited but central feature of the obscenity problem.
"In addition to drawing the line between expression and action, it is necessary to deal with one other major issue posed by the obscenity laws. This is the place of children in a system of freedom of expression. As previously indicated, that system cannot and does not treat children on the same basis as adults. The world of children is not the same as the world of adults, so far as guarantee of untrammeled freedom of the mind is concerned. The reason for this is, as Justice Stewart said in Ginsburg, that a child `is not possessed of that full capacity for individual choice which is the presupposition of the First Amendment guarantees.' He is not permitted that measure of independence or able to exercise that maturity of judgment, which a system of free expression rests upon. This does not mean that the First Amendment extends no protection to children; it does mean that children are governed by different rules. This differentiation concerns one of the most delicate as pects of the obscenity problem and embodies *168 a key concept for dealing with that problem.
"Upon the basis of these considerations the guiding principles emerge. Any communication that can be classified as `expression,' whether or not containing erotic material, is protected against any kind of abridgement by the government. In terms of the obscenity laws this means primarily that restrictions upon alleged obscenity are permissible only if a communication having a shock effect is forced upon a person against his will, or if the restriction operates only to limit dissemination of erotic materials to children. These general principles require some further elaboration and a testing against the realities of the current obscenity problem.
"Appraisal of the full protection approach is best made through an examination of its impact upon the various social interests that obscenity laws are thought to foster. Proponents of such laws have never been very precise in defining these interests. Nor has the Supreme Court, thanks to the two-level theory, done much to clarify the situation. Commentators have been more fruitful, but not always agreed. If an attempt is made, however, to classify the possible social interests in terms most relevant to the problem of adjusting obscenity controls to the system of freedom of expression, the issues resolve into the protection of society against (1) immediate harmful actions resulting from exposure to erotic materials; (2) longer-range, more remote, harmful actions; and (3) internal reactions of the individual, not necessarily reflected in overt action. The third category in turn breaks down into (a) the fantasy effect and (b) the shock effect. At another level are (4) the possible harmful results, of any of the types mentioned, from the exposure of children to erotic materials.
"(1) The possibility of immediate harmful action following from exposure to erotic material would seem to supply the strongest reason for prohibiting access to such materials. Nevertheless this likelihood, or even certainty, would not justify restriction of expression under the theory of the First Amendment here advocated. The government is expected to direct its restrictions to action and the possible advantage of preventing the action from occurring in some cases by a prior suppression of expression in all cases would not warrant the damage done to expression. Only if the communication is so closely linked to action as to be considered a part of it could the government punish or restrict the earlier stage. If this position is sound when expression consists of direct advocacy of violence or other violation of law it would appear equally sound in the case of obscenity.
"Indeed, the argument for suppression of erotic materials, on the ground they may induce illegal action, would seem substantially weaker than the argument for suppressing direct advocacy of illegal action. In the latter case the connection between the expression and the action, while often uncertain and remote, is generally thought to exist. In the former case there is no conclusive proof that any connection exists. Moreover, while the scientific case has not been demonstrated either way, there is substantial evidence that the relationship between erotic material and illegal action is at most tenuous and sporadic. Thus the leading study of sex crimes, by members of the Institute for Sex Research, reports: `It would appear that the possession of pornography does not differentiate sex offenders from nonsex offenders. Even the combination of ownership plus strong sexual arousal from the material does not segregate the sex offender from other men of comparable social level.' There is also evidence that the reading of erotic material may, by acting as a catharsis, in some cases diminish illegal acts. In addition, there is no reason to suppose that only the `objectionable' erotic materials would have the feared effect, and hence there is no ground for singling out the particular kind of eroticism the obscenity *169 laws seek to reach. Under such circumstances the presumptions in favor of First Amendment rights would plainly call for no departure from the principles applied to other forms of expression.
"(2) The social interest in the longer-range, more remote, effects of exposure to obscenity affords even less support for obscenity laws. Again there is no conclusive scientific basis for asserting that erotic materials shape attitudes or character in a manner that is harmful to society in the long run. It is most likely, of course, that reading does change attitudes and character; at least most people, especially writers, certainly assume so. Erotic reading may be injurious in its long-term effects. But no one contends that expression in any other area can be suppressed on such grounds. To do so would destroy the system of freedom of expression. Censorship of expression relating to sexual matters on any such basis is equally contrary to the fundamental premises of a system of freedom of expression and equally destructive.
"(3) (a) The original purpose of the obscenity laws was undoubtedly far less concerned with the impact of erotic materials on overt behavior than with their impact on internal moral standards. The arousing of lustful thoughts was held to be morally corrupting and it was felt necessary that society protect its members from such dangers. These moral considerations undoubtedly remain the chief driving force behind obscenity laws in the present day; otherwise it is hard to account for the emotional fervor that still surrounds the enforcement of such laws. There can be little doubt that erotic materials are designed to, and do result in `heightened sexual arousal' in many persons under proper circumstances, ranging from mild sexual excitement to orgasm. The question is whether the government may constitutionally attempt to prevent its citizens from voluntarily seeking such sexual fantasies by a system of censorship. The state may, of course, enact legislation to promote and protect the morals of its citizens. But under the First Amendment it may not pursue that goal by means of restricting expression. No one disputes that the government cannot suppress speech or writing for the purpose of shielding its citizens from nonsexual thoughts or fantasies, regardless of their effect upon moral character. There is no basis in the First Amendment, or in the concepts underlying our system of freedom of expression, for applying a different rule in the case of sexual thoughts.
"It should be added that not only is the prohibition of erotic materials, voluntarily sought by adults, incompatible with a system of freedom of expression, but such censorship is futile and discriminatory as well. Our society is crammed full of sexually stimulating reading matter, sights and events. It is literally impossible for the government to suppress all stimuli that may arouse sexual excitement, any more than it can eliminate sex. Nor can it suppress even the most erotic without eliminating much of the world's literature and art. The consequence is, as already noted, that the impact of obscenity laws falls primarily, or would if the laws could be enforced, upon particular groups in our society who happen not to prefer or be able to afford elite pornography.
"(b) When erotic materials are not voluntarily acquired or perused, but are thrust upon an individual or the general public, a different question is presented. If such a communication entails a shock effect it may be classified as `action' and subjected to appropriate regulation. The treatment of erotic communications in this manner raises some troublesome questions. Ordinarily an individual seeking to exercise the right of expression is allowed considerable leeway in obtaining access to other persons, whether or not such persons have indicated a desire to receive the communication. The emotional response to a communication, even if agonizing, is normally not ground for curtailing expression. A system of freedom of expression is supposed to `invite dispute' and encourage `robust and wide-open' controversy. Under such a *170 system even the law of libel should not authorize restriction upon communication short of an invasion of privacy. Why, then, should erotic communication be considered to pose any different problem? The answer lies in the intensity of the psychological forces that pervade our society in the area of sex. This is what creates the engulfing popular demand for obscenity laws. In our concept of privacy the sexual realm occupies an important, not to say the central, part. The notion of a `captive audience,' compelled to see or hear erotic communications, is intolerable to us. It seems reasonable, therefore, to give the ordinary person and the public at large greater protection against unwanted intrusion from the presentation of erotic material than is afforded in other areas of expression.
"If one accepts this approach many further issues remain. The first question is how to define the erotic material that would be subject to restriction under this `shock effect' concept. Most likely the phrase `patently offensive because it affronts contemporary community standards' provides the best answer. Such a formula, while vague as all formulae in this area are vague, embodies the elements that must be taken into account. Other questions concern the kinds of regulation that would be permissible. These would seem to fall into categories. The first would relate to public displays of erotic material. Thus an advertisement on a billboard or on a theater marquee might be prohibited whereas the same advertisement in a book could not. Public nudity is subject to regulation but pictures of nudes in a magazine are not. The other category involves erotic material forced into the home. It is important not to proscribe a legitimate right of access. But if a householder affirmatively makes his views known, with sufficient specificity, the government would be entitled to enforce his wishes. The difficult question here concerns radio and television. In view of the fact that radio and television signals are broadcast publicly, and enter the household without much opportunity for selection in advance, the shock effect concept would probably apply in this area also.
"The Supreme Court, it should be noted, has given some indication that it is prepared to accept the `shock effect' doctrine. Thus in the course of its per curiam opinion in Redrup the Court observed that in none of the three cases before it `was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it.' The following term, in Fort v. City of Miami, the Court let stand a conviction for public display of allegedly obscene sculptures in the defendant's backyard. The Court has not, of course, followied the proposal made here that the shock effect principle constitute the only ground for restriction of erotic communication to adults.
"(4) Acceptance of the principle that children are not part of the adult system of freedom of expression still leaves some unresolved problems. First of all it is necessary to define what materials are to be judged `obscene' for children, or otherwise proscribed for them. Such a task takes us beyond the limits of this book, and no real answers to the question will be attempted. By hypothesis the full protection theory of the First Amendment cannot be applied. Nor, in view of the present lack of knowledge about the subject, can the clear and present danger test be employed, or any test based on the effect of obscenity on children. Even a balancing test would not be feasible. We are left then, at least for the time being, with little more than a due process test that the restriction be a reasonable one. Such a test can be supplemented by the principle that a presumption exists in favor of First Amendment rights, and can be narrowed by use of the void for vagueness rule and similar procedural devices. Over the course of time sufficient knowledge may be gained to refine and elaborate the test. But presently the courts can probably do little more than accept *171 the legislative standard if it comes within the broad contours of reasonableness.
"While the legislature may have considerable leeway in the choice of standards, it is severely circumscribed by the need to fit the restrictions pertaining to children into the system of freedom for adults. Under the Butler doctrine the rights of adults cannot be curtailed by regulation designed to protect children. In the case of motion pictures or the theater, this problem is easily solved. A classification system can be established and children refused admission to those performances designated obscene under it. Otherwise, the problem of drafting regulations that will be effective for children and not interfere with adults is almost insuperable. A classification scheme in a bookstore, by which certain shelves are marked `For Adults Only,' presents obvious difficulties. Any exceptionally tight system for preventing sales to minors that resulted in retailers not stocking books banned for children would run afoul of the Butler rule. In any event, as long as material is available to adults it is hopeless to try to keep it out of the hands of adolescents.
"In short, while Butler stands, laws attempting to restrict the availability of erotic materials for minors are likely to be ineffective. Controls over such matters will have to remain, as they undoubtedly should, with parents, schools, churches and similar institutions. Legislation can partially reinforce those controls and it can give the public a feeling that `something is being done.' Beyond this it is likely to have little practical significance.
"To conclude, it is possible to bring obscenity laws into line with the basic principles of a system of freedom of expression. Dissemination of erotic materials to those who voluntarily choose to read or see them would be protected under the First Amendment. Forcing such material upon individuals who did not want them, or did not want their children to have them, or upon the public at large, would be prohibitable. Special rules could be made for children so long as they did not infringe upon adult rights.
"A system of this sort appears entirely feasible. Denmark and Sweden seem to have found it workable. Furthermore, the public demands for obscenity laws, which have led the courts to abandon all ordinary First Amendment doctrine in dealing with obscenity, might well be satisfied with such a system. Public morality would be upheld; those who did not voluntarily choose to read or see erotic materials would be protected; and parental control over material available to children would be supported. To go beyond this and try to keep erotic materials away from adults who want to see them is rather hard to justify in this day and age. A majority of the Supreme Court in effect conceded this in the Stanley case. Finally, a system of this kind would be honest. It would not ban `hard-core' pornography and allow elite pornography. Nor would it remain largely unenforced. The most likely consequence would be, as the Danish experience has shown, that, pornography no longer being unlawful and therefore tempting, the volume in circulation would diminish." (Footnotes omitted.)
I am of the opinion the Louisiana statute controlling obscenity is unconstitutional, being an unwarranted infringement upon the First Amendment of the United States Constitution which guarantees freedom of expression.
The second basis for my dissent is that I believe that under the dictates announced in Roth v. United States, supra, affirmative and convincing evidence must be introduced to establish that the film appealed to prurient interest, that it was patently offensive because it affronted the contemporary community standard of conduct, and that it was utterly without redeeming social value. Before any objective judgment can be made as to whether a film is obscene and therefore outside the protection of the First and Fourteenth Amendments, these three relevant elements of the standards *172 for judging prescribable obscenity must be established. See A Book v. Attorney General, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).
In answer to the objection that the State failed to offer any expert testimony to show the standards by which the film should be judged, the majority said: "This is, in effect, an attack upon the quantity and quality of the evidence. The film is in evidence. We have seen it. It is offensive by any standard." In Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L. Ed.2d 793 (1964), the argument was made that the judgment of whether the object was obscene was factual and allowed court review of only whether there was sufficient evidence. In rejecting that argument the court said: "* * * The suggestion is appealing, since it would lift from our shoulders a difficult, recurring, and unpleasant task. But we cannot accept it. Such an abnegation of judicial supervision in this field would be inconsistent with our duty to uphold the constitutional guarantees. * * *" The fact that the film is "offensive" does not make it "obscene". The object to be judged, in this case a film, is not evidence of what is obscene under the standards of the community.
The contemporary community standard of conduct and what is deemed to appeal to prurient interest are not determined by the subjective views of the judge or jurors who are required to decide the case. Their upbringing or particular experiences of life do not provide the necessary guidelines. It is well established that jurors should not be endowed with the prerogative of imposing their own personal standards as the test of criminality of conduct. Nor can there be "judicial notice" on the part of a judge of community standards of decency. Such standards are in constant flux, and some guidance must be offered through expert evidence to show the standards at that given time.
The United States Supreme Court's explanation of what is meant by "contemporary community standards" illustrates even more clearly why such evidence is essential. In Jacobellis v. Ohio, supra, it was said: "It has been suggested that the `contemporary community standards' aspect of the Roth test implies a determination of the constitutional question of obscenity in each case by the standards of the particular local community from which the case arises. This is an incorrect reading of Roth." Quoting from an opinion written by Judge Learned Hand that court clarified that "community" did not refer to a state or local area, but to society at large, and that under this standard the concept of obscenity varied from time to time but not from place to place. One's First Amendment rights do not fluctuate simply because of the geographical location where an expression is made.
The approach to issues of obscenity cannot be subjective, moralistic, or emotional; rather, the considerations must be made with scientific and objective evidence as a guide. Without expert evidence how can a judge or a jury determine what will appeal to the prurient interest of the average adult or what are the national community standards in the fields of art, literature, science, education, and entertainment at the present time? It is elementary in criminal law that the State bears the burden of proving every element of the crime charged. No less can be required here. If anything, public policy should dictate even greater safeguards because a judgment on First Amendment rights affects not only the defendant's right of expression but the public's right to view or read the materials in question. "To consider that the `obscenity' exception in `the area of constitutionally protected speech or press,' Roth [354 U.S.] at 485, 77 S.Ct. [1304] at 1309 [1 L. Ed.2d 1498], does not require any determination as to the patent offensiveness vel non of the material itself might well put the American public in jeopardy of being denied access to many worthwhile works in literature, science, or art. For one would not have to travel far even among the acknowledged masterpieces in any of these fields to find works whose `dominant *173 theme' might, not beyond reason, be claimed to appeal to the `prurient interest' of the reader or observer. * * *" Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).
Without evidence on the standards for judging obscenity as announced in Roth v. United States, supra, there can be no valid judgment of obscenity of the film in question, and thus there can be no valid conviction for the crime of obscenity. United States v. Klaw, 350 F.2d 155 (2nd Cir. 1965); Dunn v. Maryland State Board of Censors, 240 Md. 249, 213 A.2d 751 (1965); Hudson v. United States, 234 A.2d 903 (D.C.Ct.App.1967); In Re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968); Duggan v. Guild Theatre, Inc., 436 Pa. 191, 258 A.2d 858 (1969); House v. Commonwealth, 210 Va. 121, 169 S.E.2d 572 (1969); In Re Seven Magazines, 107 R.I. 540, 268 A.2d 707 (1970).
I respectfully dissent from the majority's finding our statute constitutional, and I dissent as well from the affirmation of conviction and sentence even accepting arguendo the constitutionality of the statute.
NOTES
[1] Appellant has argued that the search "warrant pursuant to which the film was seized was invalid because no adversary hearing preceded its issuance.
[2] Obscenity prosecution for motion pictures can be little more than a game. The penalty for the offense charged is a fine of $500.00 (which was levied in this case) or imprisonment for not more than six months, or both, except that Section (b) of the act exempts everyone in the motion picture exhibiting business who has no financial interest in the exhibition of sexually indecent films "other than wages from his said employment." In other words, the people who are hired for wages to commit this crime are exempt from prosecution. Only the employers who have a financial interest other than the receipt of wages are subject to the prosecution, and they prudently incorporate. This defendant, who is a member of the class for whose benefit this exemption was enacted, however, wisely bases no defense upon this patent discrimination which will allow it in its corporate "flakjacket" to continue to exhibit sexually explicit motion picture film regardless of the outcome of this or any other prosecution, merely upon the payment of the $500.00 fine and with the possible added inconvenience of corporate reorganization.
[3] Justices Harlan and Clark dissented from the procedural turn which the case took in the United States Supreme Court.
[4] Burstyn, supra, specifically held that the First and Fourteenth Amendments of the United States Constitution applied to motion pictures. However, the case was a censorship case.

Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), involved a conviction of a motion picture theatre manager for the violation of a state obscenity law. Justice Brennan wrote the opinion; Justice White concurred in the judgment; Justices Black and Douglas, of course concurred; Justices Stewart and Goldberg concurred in separate opinions; Justices Warren, Clark and Harlan dissented. In short, Jacobellis is without great utility.
[5] The film in this case appeals only to an interest in sex, and probably appeals to a "prurient" interest in sex, whatever that means. The material in "Benny Bungles It," the film involved here, is offensive, and would offend any community standard, local or national, and not even the defendant attributes any redeeming social value to the film. It merely complains that the trial judge didn't see all the film.
[6] In 1969, a three judge federal court upheld the constitutionality of Section (2) of R.S. 14:106. Delta Book Distributors, Inc. v. Cronvich, 304 F.Supp. 662, reversed in part and vacated in part, Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).